# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHEN DALBY and JANA DALBY,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID KASTNER and JEFF MENDEZ,<br><br>Defendants,<br><br>and<br><br>GABB WIRELESS, INC.,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2025-0136-NAC |
| AIM VENTURA CAPITAL FUND, LLC,<br>AIM VENTURA CO-INVEST I, LLC and<br>AIM VENTURA CO-INVEST II, LLC<br><br>Intervenor-Plaintiffs,<br><br>v.<br><br>GABB WIRELESS, INC.,<br><br>Defendant-in-Intervention. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

## MEMORANDUM OPINION

Date Submitted: July 21, 2025
Date Decided: August 29, 2025

Garrett B. Moritz, Eric D. Selden, Anthony M. Calvano, Thomas C. Mandracchia, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Counsel for Plaintiffs Stephen Dalby and Jana Dalby.*

Todd C. Schiltz, Oderah C. Nwaeze, Renée M. Dudek, Angela Lam, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Stephanie S. Ohnona, FAEGRE DRINKER BIDDLE & REATH LLP, Philadelphia, Pennsylvania; *Counsel for Defendants David Kastner and Jeff Mendez.*

Rebecca L. Butcher, Jennifer L. Cree, Howard W. Roberston IV, LANDIS RATH & COBB LLP, Wilmington, Delaware; *Counsel for Nominal Defendant and Defendant-in-Intervention Gabb, Wireless, Inc.*

Travis J. Ferguson, Faith C. Johnson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Counsel for Intervenor-Plaintiffs AIM Ventura Capital Fund, LLC, AIM Ventura Co-Invest I, LLC, and AIM Ventura Co-Invest II, LLC.*

**COOK, V.C.**

When Stephen Dalby, a father of eight and former seminary schoolteacher, set out to buy his twelve-year-old son a phone, he could not find one that he felt comfortable buying for a child.  So he decided to make one.  Dalby founded Gabb Wireless, Inc. ("Gabb" or the "Company"), a technology company and cellular network designed to provide safer cellular phone options for children.

Gabb was quickly successful.  Two years after Dalby started the Company, Gabb closed its "Series Seed" round of funding, led by AIM, a Utah-based growth equity fund.  A year later, Gabb closed its "Series A" round, led by another Utah-based investment firm, Sandlot.  Then things soured.  That fall, AIM and Sandlot's board of director designees (the "Preferred Directors") voted to remove Dalby as CEO.  Dalby sued.  The parties settled.  The settlement agreement provided Dalby with certain protections:  Until the Company raised a "Series B" round of funding, Dalby would remain on the board of directors and could not be diluted.  Dalby also had the right to appoint two other directors.

Things did not get much better after the settlement agreement.  Within months of the settlement, Gabb's management, which had strong ties to AIM, was already thinking of ways to remove Dalby from the board of directors.  At a board of directors meeting, the Preferred Directors voted to remove Dalby from the board of directors.  Dalby and his director designees voted to remove the Company's CFO.  Both removals violated the settlement agreement, and ultimately, Dalby, management and the Preferred Directors worked things out for the sake of reaching a Series B round of funding.  When the Series B raise failed, everything went off the rails.

Dalby removed one of his two director designees and replaced him with his wife, Jana Dalby. Management and the Preferred Directors tried to put pressure on Dalby by asserting that the director's removal and Jana Dalby's appointment was a breach of the Company's agreement with a major lender. That plan backfired when the lender actually demanded that Dalby undo his wife's appointment and reinstate the director he had removed. Dalby refused. The lender did not extend additional credit to Gabb.

Because of the distrust between Dalby and management and the Preferred Directors, the Company could not secure additional debt or equity to fix the hole in its budget.

Behind the scenes, Gabb's management and the Preferred Directors were again secretly working to remove Dalby from the board of directors. To be fair, their concerns were not entirely unfounded. The dysfunction at the board of directors had gotten so bad that, so long as Dalby remained a director, the chances that the company could obtain additional funding were slim to none. Perhaps even more troubling was Dalby's behavior.

In the summer of 2024, Gabb's management heard from one of Dalby's neighbors that she had filed for a civil protection order against him for allegedly stalking her family and minor children. When management hired an investigative firm, the firm uncovered, among other things, several recent police reports documenting Dalby's erratic behavior. The police reports did not result in any arrests, but, based on Dalby's volatile behavior and past incidents, Gabb's

2

management developed serious concerns over his continued involvement in the Company.

Management and the Preferred Directors enlisted the help of Gabb's outside counsel to remove Dalby from the board of directors. The Company was invoiced for all of the legal fees. The removal effort was no small cost for a Company that was hemorrhaging money and was months away from not being able to make payroll. The Dalbys were unaware that management and the Preferred Directors were secretly using Company resources to further Dalby's removal from the board of directors. When, eventually, Dalby learned that a removal effort was in the works and asked if Company resources were being used to fund the effort, management and the Preferred Directors did not respond.

Outside counsel advised that AIM and Sandlot could not lead the removal effort because of their past litigation with Dalby. So management handpicked a stockholder to serve as the face of the removal effort. But that stockholder contributed little more than its name. Gabb's outside counsel drafted all the documents for the removal, and Gabb's management continued to spearhead the effort. When Dalby's removal was presented to Gabb's stockholders, management solicited stockholder votes and Gabb's outside counsel kept the official tally.

At the same time that management and the Preferred Directors were planning Dalby's removal, the Company's financial problems were coming to a head. Management did not see bankruptcy as a viable solution because it would not get rid of Dalby. Gabb's outside counsel came up with a plan that would kill two birds with

one stone: AIM would elect to convert a note that it held and would also infuse the company with an additional $1 million. The note conversion would then be declared a Series B round of financing and the protections that Dalby had bargained for under the settlement agreement would vanish. AIM could then effectively take over the Company and try to save an investment that was threatening the success of its fund. As soon as Gabb's stockholders voted to remove Dalby, the Preferred Directors approved the note conversion and adopted a resolution recommending that Gabb's stockholders vote to amend and restate the Company's certificate of incorporation to authorize the stock necessary for the conversion to proceed.

This litigation ensued. Stephen Dalby and Jana Dalby brought this action challenging Dalby's removal from Gabb's board of directors. AIM intervened, seeking an order of specific performance requiring Gabb to issue the necessary shares of stock to AIM to effectuate the conversion.

After trial, I conclude that Dalby's for cause removal was invalid. I also conclude that the Company has breached the terms of AIM's convertible note but AIM is not entitled to specific performance.

## I.     FACTUAL BACKGROUND

The facts are drawn from the post-trial record, which includes 197 stipulations of fact, over 900 exhibits, depositions from thirteen witnesses, and trial testimony

4

from nine witnesses.[1] Having evaluated the credibility of the witnesses and weighed the evidence, the Court makes the following findings.

### A.    The Company

In 2018, Plaintiff Stephen Dalby founded Gabb Wireless, Inc., a Delaware corporation with its principal place of business in Lehi, Utah.[2] Gabb is a technology company and cellular network designed to provide safer cellular phone options for children.[3] The idea for the Company was born when Dalby, a father of eight[4] and former seminary schoolteacher,[5] could not find a cell phone he felt comfortable buying for his twelve-year-old son.[6]

### B.    The "Series Seed" and the Series A Financing Rounds

On March 9, 2020, Gabb closed its "Series Seed" round of funding with Intervenor-Plaintiff AIM Ventura Capital Fund, LLC ("AIM Ventura").[7]    AIM

---

[1] Joint trial exhibits are cited as "JX ___," trial testimony is cited as "TT ____ ([Name])," and depositions are cited as "([Name]) Dep. ____." Pincites refer to internal pagination. When discussing Stephen Dalby and Jana Dalby, the Court refers to Stephen Dalby as "Dalby" and Jana Dalby as "Jana" for convenience and to avoid confusion. No disrespect is intended.

[2] Dkt. 147, Pre-Trial Stip. and Order ("Pre-Trial Stip.") ¶¶ 2, 6. *See generally* JX 1 (Worth.com article about Gabb).

[3] Pre-Trial Stip. ¶ 6.

[4] *E.g.*, TT 296:2–8 (Dalby).

[5] JX 1 at 1; TT 204:13–205:10 (Dalby).

[6] JX 1 at 1–2.

[7] Pre-Trial Stip. ¶ 10.

Ventura is a Utah-based growth equity fund that "specializes in lower market revenue generating companies," and is associated with Adams Wealth Advisors.[8] Gabb subsequently closed its "Series A1" financing round with two other entities related to Adams Wealth Advisors: Intervenor-Plaintiffs AIM Ventura Co-Invest I, LLC and AIM Ventura Co-Invest II, LLC (the "AIM Co-Invest Entities," and together with AIM Ventura, "AIM" or "Intervenor Plaintiffs").[9] Around the time of AIM's investment, Greg Cole became the Company's CFO.[10]

Cole is "a co-founder of the AIM funds and holds a 50% interest in AIM Ventura Capital Management Fund, which is the manager of the AIM funds."[11] Cole is also an investor in AIM Ventura, AIM Ventura Co-Invest I, LLC and other AIM entities.[12] AIM's website and its June and October 2024 quarterly investor updates list Cole as a "Partner & Managing Director" or member of "Portfolio Management."[13] Cole spends "about one day a week" working out of the Adams Wealth Advisors office.[14]

About a year after its Series Seed round, on April 21, 2021, Gabb closed its "Series A" round of funding with Sandlot Opportunity Partners Fund IV LLC, Sandlot

---

[8] Pre-Trial Stip. ¶ 7.

[9] *Id*. ¶¶ 8–10.

[10] JX 800 at 2 (Cole's LinkedIn Profile).

[11] Pre-Trial Stip. ¶ 21; *see also* TT 388:18–392:2 (Cole).

[12] Pre-Trial Stip. ¶ 21; *see also* TT 411:11–412:14 (Cole).

[13] JX 798; JX 159 at 4; JX 349 at 2.

[14] TT 413:13–24 (Cole).

Opportunity Partners Fund IX LLC, and Sandlot Partners Opportunity Fund XIV (collectively, "Sandlot").[15]

AIM holds 12,504,968 shares of Gabb's preferred stock, and Sandlot holds 9,195,276 shares of Gabb's preferred stock.[16] Following its Series Seed and Series A rounds, Gabb amended its certificate of incorporation to provide for a five-director Board.[17] Of the five director seats, Dalby could appoint three "Common Directors," and AIM and Sandlot could each appoint one "Preferred Director."[18]

In March 2021, AIM Ventura designated Greg Cole as its Preferred Director designee to the Board.[19] In addition to Cole, at various points in time, AIM has designated Craig Adams, David Kastner, and Cormac Murphy to its Board seat.[20] Currently, Defendant David Kastner holds the seat. AIM's June 2024 and October 2024 quarterly investor updates identify Kastner as part of AIM's "Portfolio Management."[21]

---

[15] Pre-Trial Stip. ¶ 18.

[16] *Id.* ¶¶ 7–9, 15–17.

[17] *Id.* ¶ 35.

[18] *Id.*

[19] *Id.* ¶ 12.

[20] *Id.* ¶ 11.

[21] JX 159 at 4; JX 349 at 2.

Sandlot initially appointed Defendant Jeff Mendez to Sandlot's Preferred Director seat.[22] On April 11, 2025, Sandlot replaced Mendez with Casey Baugh, a Sandlot principal.[23] At trial, Mendez testified that "my fiduciary [sic] is to Sandlot."[24]

In connection with Gabb's Series A round, Dalby, AIM Ventura, Sandlot, and other investors in the Company executed an Investors' Rights Agreement.[25]

## C. The 2021 Action, the Settlement Agreement, and the Amended and Restated Voting Agreement

After AIM and Sandlot's investment, Dalby continued to serve as Gabb's CEO and as a director. At the time, Cole held AIM's Preferred Director seat and Mendez held Sandlot's Preferred Director seat. The other Common Director seats remained vacant.

On October 25, 2021, before Dalby was able to appoint two additional Common Directors, Cole and Mendez voted to remove Dalby as CEO. Following his removal, Dalby sued the Preferred Directors. The litigation was captioned *Stephen R. Dalby v. Greg Cole, et al.*, C.A. No. 2021-1068-PAF. On January 21, 2022, the Court entered a Status Quo Order (the "SQO").[26] Among other things, the SQO enjoined the

---

[22] Pre-Trial Stip. ¶ 36.

[23] *Id.* ¶ 5.

[24] TT 606:24–607:6 (Mendez).

[25] JX 5 (Investors' Rights Agreement).

[26] Pre-Trial Stip. ¶ 40; *see also* JX 8.

8

Company and the Board from "[a]uthorizing [or] issuing . . . any securities of the Company (including without limitation any . . . options . . . )."[27]

On June 2, 2022, the parties resolved the litigation through a Settlement Agreement.[28]  Under the terms of Settlement Agreement, Dalby agreed to step down as CEO in favor of Nathan Randle—AIM and Sandlot's desired candidate.[29]  The parties agreed that Randle would "serve in the CEO role through the initial closing of Gabb Wireless's next round of bona fide financing for the primary purpose of capital . . . (the 'Series B')."[30]  The parties also agreed that Cole would step down from the Board but would continue serving as the Company's CFO until the Series B round closed.[31]

Although Dalby was no longer the Company's CEO, the Settlement Agreement provided that he would serve as the "CEO Director" until the Series B round closed or a new CEO was appointed.[32]  He could also continue to appoint two "professional and experienced" Common Directors.[33]  The Settlement Agreement required that

---

[27] JX 8 ¶ 3.c.

[28] *See* JX 20.

[29] Randle previously worked as the Chief Marketing Officer of Vivint Smart Home where Mendez served as the Executive Vice President.  TT 484:1–2 (Randle); TT 570:5–10 (Mendez).

[30] JX 20 § 1.

[31] *Id.* § 2.

[32] *Id.* § 3(a).

[33] *Id.* § 3(b).

9

Dalby's appointments to the Common Director seats "have the appropriate professional background and experience necessary to fill the role" and "be interviewed by one other member of the Board prior to being confirmed . . . to the applicable Common Director seat."[34] Per the Agreement, Dalby was to appoint Thomas Alexander and Jared Sine as two Common Directors.[35] The Settlement Agreement also provided that while Jeff Mendez would continue as Sandlot's designee, Cole would be replaced by Craig Adams as AIM's designee.[36]

And the Settlement Agreement provided, in a provision entitled "No Additional Dilution," that "[i]f additional capital needs to be raised prior to a Series B round of financing, any dilution shall be borne solely b[y] AIM Ventura and Sandlot and not b[y] Dalby."[37] After the Settlement Agreement, Dalby remained the Company's largest stockholder. As Clayton testified, Dalby "owns almost 49 percent" of the Company.[38]

As part of the Settlement Agreement the parties also agreed to a provision entitled "Non-Disparagement," which required the parties to refrain from making

---

[34] *Id.*

[35] *Id.*

[36] *Id.* § 3(c).

[37] *Id.* § 7.

[38] TT 17:3–4 (Clayton) ("Mr. Dalby owns almost 49 percent, 48 point something percent of the company."); *see also* JX 702 (native) (Gabb Wireless, Inc. Detailed Cap Table) (showing as of Jan. 14, 2025, Dalby owns 48.893% of the Company).

statements disparaging, demeaning, or discrediting another party to the Settlement Agreement—including through posting on any website or social media platform.[39]

On September 15, 2022, after the action was dismissed by stipulation, the parties executed an Amended and Restated Voting Agreement.[40] Consistent with the terms of the Settlement Agreement, under the Amended and Restated Voting Agreement, Dalby has the right to designate two Common Directors and hold the third Common Director Seat as "CEO Director."[41] In a provision entitled "Disqualified Designee," Dalby, AIM, and Sandlot agreed they would not knowingly appoint a director who was a "bad actor" per Rule 506(d)(1)(i)–(viii) of the Securities Act of 1933 and to remove such a director if appointed.[42] The Voting Agreement also contains an "Irrevocable Proxy and Power of Attorney" provision.[43] In brief, the text provides that if a party to the agreement votes its shares in a manner inconsistent with the Voting Agreement, that stockholder grants the CEO an irrevocable proxy and power of attorney to vote the shares instead.[44] As in the Settlement Agreement, many of the protections afforded Dalby by the Amended and Restated Voting Agreement terminate upon the "Next Equity Financing," which is defined as "the

---

[39] JX 20 § 21.

[40] JX 27.

[41] *Id.* § 1.2(c).

[42] *Id.* § 5.3.

[43] *Id.* § 4.2.

[44] *Id.*

11

initial closing of the Company's next bona fide equity financing for the primary purpose of raising capital."[45]

On the same day that Amended and Restated Voting Agreement was executed, the Board amended and restated Gabb's Bylaws.[46] Gabb's Amended and Restated Bylaws provide: "At all meetings of the Board, a majority of the total number of directors then serving on the Board shall constitute a quorum for the transaction of business."[47]

### D.    The LinkedIn Post

In June 2022, after the Settlement Agreement was signed, Dalby published a LinkedIn post that, in part, discussed how Cole and Mendez had removed him as CEO (without identifying the two Preferred Directors by name).[48] The post included statements that "I was fired from the very company that I started" after "[t]wo big investors . . . planned and executed the perfect coup" and "did it in a pathetically dishonest, and illegal way – feel free [to] look up the lawsuit ;)[.]" But the post was otherwise largely a positive message about moving on after life's challenges, "[g]oing from 60 to 0 mph[,]" "[m]ore fishing with my boys[,]" and "[l]et[ing] it go." Dalby wrote "please no sympathy comments, I've never been happier :)" and encouraged others

---

[45] *Id.* § 1.2(c).

[46] JX 29.

[47] *Id.* § 2.9.

[48] Pre-Trial Stip. ¶ 43; *see also* JX 26.

facing similar challenges to "[l]earn from it, improve, start again."[49] Dalby hashtagged the post "#thankyou" and included a photo of himself standing waist-deep in a stream, smiling and holding a fish.[50] The post received more than 700 comments and shares.[51] When the Company pursued venture capital firms for its Series B round, some firms reportedly cited the post when declining to invest.[52]

Several months after the post, on November 7, 2022, an attorney for Cole and Mendez sent a cease-and-desist letter stating that the post violated the Settlement Agreement's Non-Disparagement provision and threatening legal action over the post as well as other alleged breaches of the Settlement Agreement.[53] Dalby's attorney responded, countering with allegations that, in March 2022, Cole and Mendez had issued significant option grants in a self-dealing transaction.[54] Cole and Mendez did not pursue legal action against Dalby.[55]

---

[49] JX 26 at 1.

[50] *Id.* at 1–2.

[51] JX 44.

[52] *See* JX 1125; TT 405:5–406:15 (Cole).

[53] JX 44.

[54] JX 45.

[55] *See* TT 405:5–406:15 (Cole) (explaining that Cole and Mendez ultimately determined it was best not to proceed with legal action and instead focus on the Series B).

13

### E.    Dispute Over March 2022 Options

During negotiations over the Settlement Agreement, Cole confirmed to Dalby's personal counsel, Kirkland & Ellis LLP, that "[t]here will be no refreshing of the option pool prior to the [S]eries B [financing]."[56] Any option grants in March of 2022 would have also violated the SQO's prohibition on "[a]uthorizing [or] issuing . . . any . . . options."[57]

But, after the Settlement Agreement was reached, Dalby learned for the first time that Cole, Randle and Mendez claimed to have issued themselves millions of options at a March 24, 2022 Board meeting, later ratifying the grants in an "executive session" at the end of a Board meeting on March 31, 2022.[58]

What actually transpired at the March 24 and March 31 Board meetings remains unclear. Yet the record is certain on one point: the Board did not approve option grants on March 24.[59] The claim that the Board approved option grants at the meeting is contradicted by the fact that on March 25, Gabb's outside counsel, Jeff Bowman circulated a unanimous written consent for the Board to "approve[ ] the stock options *discussed* at yesterday's meeting."[60]

---

[56] JX 11.

[57] JX 8 ¶ 3.c.

[58] (Stephen Dalby) Dep. 278:8-280:8; *see also* JX 47 (Dalby's audio recording of conversation with Common Director Anne Butler and her husband Bill Butler discussing the options).

[59] *See* JX 40.

[60] JX 40 at 7 (emphasis added).

Dalby did not oppose the March 2022 option grants as to line-level employees.[61] But he continues to dispute Randle, Cole, and Mendez's claims that they granted millions of options to themselves in March 2022. This issue has proved to be an ongoing source of tension between Dalby and the Preferred Directors and Company management. And Dalby's concerns were not entirely unfounded: When discussing Gabb's Series B with Cormac and counsel, Kastner wrote, "Back to the employee options. It is currently 19.97% of pre-money outstanding, which is at least 2x of what you would expect of a company of this size."[62]

### F. The First Removal Effort

In the fall of 2022, Cole—apparently summarizing a conversation—wrote about Randle taking the CEO Director Board seat.[63]

The rest of the notebook page included ideas for how to take the CEO Director seat—for instance, by informing Dalby that the No Additional Dilution provision was no longer in effect because Dalby had "damaged [the] chances of Series B with his [LinkedIn] post."[64]

---

[61] *E.g.*, JX 47.

[62] JX 644 at 1.

[63] JX 17 at 9.

[64] *Id.*

15

> 7- No additional dilution. removed because he has damaged chances of Series B with his post

Indeed, Cole was not only interested in removing Dalby from the CEO Director seat but also wanted to eliminate Dalby's right to designate the two other Common Directors.[65]

> — How do we get rid of his rights on the 2 common seats?

And other members of the Company's leadership were exploring eliminating Dalby's rights under the Settlement Agreement and Voting Agreement too.[66] Mendez confirmed at trial the Preferred Directors were "for sure out to get [Dalby] in his role as a board member of Gabb."[67] In another notebook entry where Cole seemed to be memorializing what Mendez said at an executive meeting, Cole wrote: "#1 goal removal" and "get 3 seats."[68]

> S Mendez (Be smart as possible non-emotional #1 goal removal) get 3 seats

---

[65] JX 17 at 14.

[66] *See* TT 592:22–593:1 (Mendez) ("Q: And the brainstorming to remove Mr. Dalby from the board, you said, occurred as early as 2023; correct? A. Or even before then, 2022.").

[67] TT 604:14–605:14 (Mendez).

[68] JX 17 at 22; *see also* TT 419:1–10.

16

So, within months of signing the Settlement Agreement, the Preferred Directors and Company management had resumed their campaign to remove Dalby from the Company.

### 1. "Project Kingdom of Heaven"

Gabb's Preferred Directors and management grew increasingly desperate to remove Dalby. As memorialized in Cole's notebook, among other concerns they worried that, with Dalby still on the Board, the Company would not be able to attract serious investors for the Series B round because of the "founder drama."[69]

Additionally, the Preferred Directors and management thought that Dalby was making things difficult by, among other things, routinely requesting status updates from Randle but never appearing for the scheduled call.[70]

And they were also concerned about Dalby's pattern of appointing and firing directors.[71] Between March 2022 and December 2022, Dalby had appointed five

---

[69] JX 17 at 14.

[70] JX 1144 at 2–3.

[71] JX 1124 at 2 ("One of the trust issues between [Dalby] and the rest of the board, and Gabb's management has been [Dalby's] impact on board stability . . . . There is an ask from the rest of the board and management for Stephen to commit to board stability and enable Gabb to attract investors at the maximum valuation possible. An unstable and dysfunctional board harms Gabb's ability to operate and hurts its valuation."); JX 56 at 3; JX 815; TT 207:21–219:14 (Dalby); *see also* JX 74 (Dalby's audio recording of the August 3, 2023

17

Common Directors and fired three of them.[72] Dalby expected his appointees to vote with him;[73] if they did not, he would fire them or ask them to resign.[74]

In early May 2023, Pascal Brochier, who was appointed as a Common Director by Dalby in December 2022, conveyed to Dalby that the other directors and Gabb's management had serious concerns about Board instability.[75] In response, Dalby acknowledged that "the lack of board stability" "may be a factor" in Gabb's failure to attract investors at the maximum valuation, but largely blamed Gabb's management team and the efforts to shut him out of Company decision-making.[76] Three weeks later, on May 28, 2023, Dalby removed Brochier from the Board and replaced him with Steve Zolman.[77]

---

Board meeting where Mendez identified the "musical chairs" "at the Board level" as the "number one obstacle" to the Company securing a Series B round of financing). On the Exhibit List, Defendants challenged the admissibility of JX 74 on hearsay grounds under D.R.E. 802. But Defendants did not address the merits of the objection in post-trial briefing as required by the Pre-Trial Stip. *See* Pre-Trial Stip. ¶ 223. I therefore deem the objection waived.

[72] *See* JX 56 at 3; JX 815; TT 207:21–219:14 (Dalby).

[73] JX 549 at 2 (text messages from Common Director Mike Hammond to Kastner writing: "I was told to give [Dalby] my word to vote a certain way or he had to do something. I am not playing that game."); TT 244:33–345:4 (Dalby) ("If you had started a company and I invited you to be part of the board and you didn't feel comfortable with something, the very first time you said that, I would respect that."); *see also* JX 47 (recording of Dalby arguing with then-Common Director Anne Butler about her disagreeing with him on his vision for the Company and him not getting "buy-in" from her).

[74] *See* TT 207:21–219:14 (Dalby).

[75] JX 1124.

[76] *Id.* at 1.

[77] JX 53.

After his removal, Brochier stayed in touch with Gabb's other directors and management. On June 7, 2023, Brochier emailed Cole, Mendez, and then-Preferred Director Adams, attaching a document titled "Project Kingdom of Heaven."[78] In the cover email, Brochier wrote, "Why Kingdom of Heaven you probably wonder? It is allegedly a great movie that has been ruined by bad acting . . . I have been exploring the 'bad actor' case and believe there might be a strong case to remove Dalby with cause. See attached."[79]

The attached document was partly generated by Brochier's prompting ChatGPT with: "What are some of the actions and behaviors of a bad actor that may constitute ground for termination for cause of a company director in Delaware law?"[80] In response, ChatGPT generated "some general information about grounds for termination for cause of a company director based on Delaware law."[81] Brochier also put together a timeline of "[s]pecific actions observed and documented" that he thought might be grounds for Dalby's removal based on ChatGPT's response.[82] Those actions included, among others, Dalby's "showing up uninvited at Gabb Christmas

---

[78] Pre-Trial Stip. ¶ 89; JX 56–57.

[79] JX 56 at 1.

[80] *Id.* at 2.

[81] *Id.*

[82] *Id.* at 3–4.

party in defiance of legal order not to have direct contacts [sic] with employees" in December 2022 and ignoring a Board meeting invitation sent in April 2023.[83]

Gabb's management and the Preferred Directors continued discussing the plan to remove Dalby throughout the summer but thought that they would give Dalby one last chance before removing him. On July 20, 2023, Randle emailed Kastner, Mendez, Cole and others about setting up a meeting with Dalby, in which they could compel his cooperation in the Series B process.[84] The goal was to have Dalby "sign[ ] an agreement that he will approve term sheet(s) that fall within an agreed-upon multiple range and valuation range."[85] Randle wrote that without such an agreement from Dalby, he "w[ould] not pitch the company" and that if Dalby was not willing to meet to discuss the Series B, "we go full force on preparing for a stockholder vote/removal."[86] He also stressed the urgency of the situation, writing: "We need to move on this quickly because I'd like to have clarity by no later than October 1. By then we should either be in Series B prep mode with an [investment bank] that we have selected or we should have already voted Dalby out."[87]

---

[83] *Id.* at 3–4.

[84] JX 67.

[85] *Id.*

[86] *Id.*

[87] *Id.*

Randle and the Preferred Directors went back and forth on proposed draft emails to Dalby asking to meet about the Series B.[88] Kastner believed that the email needed to "convey[ ] that this proposed meeting is well thought out," for it to "be obvious to [Dalby] that this is a serious request," and to appear "of a professional nature if it is presented to a judge."[89]

On July 27, 2023, management and the Preferred Directors finally set the plan into action. Randle emailed Dalby the text that Kastner had drafted, asking to set up an "open and honest conversation regarding [Gabb's] current position and the next steps required for a necessary Series B funding round."[90] Randle wrote that he envisioned the conversation as an "informal discussion" between Dalby, Mendez, Kastner and himself.[91] After the parties had fixed a time for the discussion, Dalby suggested that the informal discussion be replaced with a Board meeting "so that we can . . . have the flexibility to make actions steps [sic] necessary to help further the company's vision and maximize its potential."[92] Dropping Dalby off the thread and adding Cole instead, Randle emailed Kastner and Mendez, writing: "Here we go. . . . This is one more reason we need to get rid of this guy. We schedule a meeting well

---

[88] *See e.g.*, JX 72.

[89] *Id.* at 4.

[90] JX 73 at 2–3.

[91] *Id.* at 3.

[92] *Id.* at 1–2.

21

in advance to proactively discuss our next round of funding and we can't even make that happen."[93] Randle suggested that Kastner or Mendez reply letting Dalby know either that they are not available for a Board meeting, or that there is already a meeting scheduled at the exact same time to specifically discuss the Series B.[94]

### 2.     The August 3, 2023 Board Meeting

On August 3, 2023, shortly before the scheduled Board meeting, Dalby executed a stockholder consent removing David Packer from Gabb's Board, and appointing his wife, Jana Hawke Dalby in Packer's place.[95] Less than thirty minutes before the scheduled Board meeting, Dalby emailed the other Board members, letting them know that Jana had joined the Board.[96] Dalby did not attach the stockholder consent to this email.

Dalby, Jana, Zolman, Kastner, Mendez, Randle, and Bowman attended the Board meeting.[97] Without Randle, Kastner, Mendez, and Bowman's knowledge, Dalby recorded the entire meeting.[98] At the start of the meeting, each of the Company's directors agreed that Gabb's number one priority was securing a Series B

---

[93] *Id.* at 1.

[94] *Id.*

[95] JX 75 at 4–5; *see also* JX 76 (email from Dalby to other directors letting them know that Jana Dalby has joined the Board).

[96] JX 76.

[97] Pre-Trial Stip. ¶ 55; *see also* JX 74.

[98] *See* JX 74.

round of financing.[99]  But the meeting quickly devolved into what Dalby described as the "wild, wild west."[100]

The Preferred Directors accused Dalby of jeopardizing the Series B by creating Board instability through his "musical chairs" approach to the Common Director seats.[101]  Kastner and Mendez stressed that the instability made the Company unattractive to potential investors and threatened the Series B effort.[102]  Dalby responded by blaming the Company's inability to secure the next round of financing on management's poor performance and the lack of unity and respect between the management team and himself.  He singled out Cole as the greatest barrier to re-establishing trust between himself and the management team and motioned for Cole's removal from the CFO role.[103]  When the motion was put to a vote, the three Common Directors voted for Cole's removal and the two Preferred Directors voted against it.[104]  After the vote, the Preferred Directors objected that the vote was invalid

---

[99] *Id.*

[100] JX 122 at 3.

[101] JX 74.

[102] *Id.*

[103] *Id.*

[104] *Id.*

23

because, among other reasons, Zolman and Jana were not duly elected members of the Board at the time of the meeting.[105]

Kastner then motioned to remove Dalby from the Board on account of his breaches of fiduciary duty.[106] The Preferred Directors purported to vote for Dalby's removal, and the Common Directors voted against it.[107] After purportedly voting to remove Dalby, the Preferred Directors voted to elect Randle as a member of the Board and Executive Chairman, to fill the vacancies created by Dalby's removal.[108]

After the meeting, both sides insisted that their actions were valid.[109] Yet, Cole remained CFO and Dalby remained the CEO Director and Chairman. And the Preferred Directors and management scrambled to confirm whether Dalby could actually amass the stockholder support needed to validly remove Cole without violating the Settlement Agreement.[110] Randle texted in a group chat with Cole and Kastner, sharing that he had heard that Dalby did not have the support of an

---

[105] *Id*.; *see also* JX 77 at 1–2 (email from Bowman to Dalby's counsel, writing: "First the Company is both confident and firm in its position expressed at the August 3, 2023 meeting of the Board of Directors . . . . Steve Zolman and Jana Hawke Dalby were not duly elected members of the Board at the time of the August 3 Board meeting. Among other issues, no actions by written consent compliant with Section 228 of the [DGCL] relating to the election of either Steve Zolman or Jana Hawke Dalby were delivered to the Company . . . .").

[106] JX 74.

[107] *Id*.; JX 77 at 1–2; Pre-Trial Stip. ¶ 55.

[108] JX 74; JX 77.

[109] *See e.g.*, JX 77.

[110] *See* JX 79 at 2.

24

important stockholder.[111]  Among other things, Randle shared that the stockholder "[h]asn't talked to Dalby since May," that "Dalby texted him asking if they were still friends," and that "[Dalby and the stockholder] never got together."[112]  Kastner replied: "That's great news that Stephen [Dalby] has no friends!"[113]  Randle "liked" Kastner's message.[114]

## G. The Financing Facilitation Agreement

To stabilize the Board and attract investors for the Series B round, the Preferred Directors and management wanted Dalby to sign a Financing Facilitation Agreement (the "FFA").[115]  Among other things, the FFA contained a "drag-along" provision requiring Dalby to vote in favor of a financing round if it was at a pre-money valuation of at least $200 million, had a secondary offering in which Dalby could sell at least $12 million worth of common stock, and was approved by the Board.[116] Gabb's management also wanted Dalby to agree in the FFA to replace Jana as one of his Common Director designees with Spencer Tall.[117]

---

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] TT 219:23–220:12 (Dalby).

[116] JX 97.

[117] *E.g.* JX 83 at 1 (email from Cole, providing [Mendez, Kastner, and I] are "very firm on the point that Spence Tall takes the other board seat.  The only other option is to have Nate Randle take the CEO/Director seat.").

Dalby did not sign the FFA as quickly as the Preferred Directors and management would have liked.[118] Having failed both to persuade Dalby and to purportedly vote him off the Board, the Preferred Directors and management decided to change tack and trick him.

### 1. Cole Asks Blue Diamond to Send a "Maturity Notice" Letter to Pressure Dalby

The Company had an outstanding $10 million loan from one of its stockholders, Blue Diamond.[119] The loan was poised to mature on October 6, 2023.[120] But, the approaching maturity date had not been a cause for great concern. Earlier in the summer, on June 16, 2023, Brendan Ball, a representative for Blue Diamond confirmed for Cole and the Company's auditors that Blue Diamond would "work out an extension" with Gabb "to facilitate the Series B raise."[121]

On September 20, 2023—as Dalby continued to drag his feet on signing the FFA—Ball wrote internally at Blue Diamond that Gabb management wanted to

---

[118] *E.g.*, JX 83.

[119] Pre-Trial Stip. ¶ 53; JX 92. "Blue Diamond" refers to Bingham Family Alaska, LLC, Blue Diamond Capital, LLC, and Blue WCS, LLC. Bingham Family Alaska, LLC is a Utah limited liability corporation with its principal office located in Provo, Utah. Pre-Trial Stip. ¶ 31. It holds 470,741 shares of Gabb's preferred stock. *Id.* Blue Diamond Capital, LLC is a Utah limited liability corporation with its principal office located in Provo, Utah. *Id.* ¶ 32. Blue Diamond Capital is the manager of Bingham Family Alaska, LLC. *Id.* Blue WCS, LLC is a Utah limited liability corporation with its principal office located in Provo, Utah. *Id.* ¶ 33. It holds 470,741 shares of Gabb's preferred stock. *Id.*

[120] *E.g.*, JX 92.

[121] JX 60; TT 329:2–20 (Ball); *see also* JX 83 (August 22, 2023 email from Cole to counsel, writing "Blue Diamond is supportive of what we are doing and has agreed to extend").

discuss "some strategies" that "relate[ ] to their efforts to deal with the problematic founder Stephen Dalby."[122]  Ball explained that Gabb "[m]ight have us get more aggressive on our loan for the sake of getting Dalby to play ball on the company strategy."[123]  Two days later, Ball ran a draft "maturity notice" letter by the Blue Diamond team, explaining, "we are trying to apply some pressure to Stephen Dalby to perform on his outstanding agreement with Gabb that basically creates a drag along agreement to Series B if they can achieve a $200M+ valuation."[124]  Providing additional background, Ball wrote "Stephen [Dalby] has held up many of the business progress [sic] and in particularly [sic] the [Series B] raise effort."[125]

That same day, Ball shared the draft "maturity notice" letter with Cole.[126] When Cole received the letter, he sent it around to Kastner and Gabb's new General Counsel, Vanessa Clayton, writing "[l]et me know what you think…"[127]  Clayton had just joined Gabb the month before.[128]  Before joining Gabb, Clayton had served as

---

[122] JX 88.

[123] *Id.*

[124] JX 89.

[125] *Id.*

[126] JX 90; *see* JX 89 (email from Ball to other members of the Blue Diamond team asking for comments on the draft letter and stating "I'll shoot it to [G]reg [Cole] for his agreement before putting it on official letterhead").

[127] JX 90.

[128] TT 19:15–18 (Clayton).

27

General Counsel for seven years at Homie, another AIM portfolio company where Cole was also a board member.[129]

On October 2, 2023, Randle circulated Blue Diamond's "maturity notice" letter to the Board. In the cover email, Randle flagged that "[t]he loan matures this Friday, October 6" and requested an in-person Board meeting on Thursday.[130] Randle wrote: "I know there have been several conversations regarding a financing facilitation agreement, but because it has not been finalized – Blue Diamond will not extend our debt."[131]

Earlier that same day, Ball had warned his team that he expected Dalby or Jana to call Blue Diamond's front desk wanting to speak with him. He indicated that he had talked to Cole, who suggested that Blue Diamond ignore the Dalbys, since, in Cole's experience Jana would just "go[ ] on a rant forever and is a waste of time."[132] Ball also explained that Gabb management was prepared for the loan to go into default if Dalby refused to sign the FFA.[133]

---

[129] Pre-Trial Stip. ¶ 21; TT 18:15–19:4 (Clayton); TT 413:7–10 (Cole).

[130] JX 92.

[131] *Id.*

[132] JX 91.

[133] *Id.* ("I'm aware the loan matures this week and so is Gabb. They basically are planning on some default interest (hopefully only a few days) unless Stephen [Dalby] will sign the agreed upon exit strategy documents.").

Under pressure and seeking to avoid a default, Dalby accepted the demanded terms.[134]

## 2. The Parties Sign the FFA

On October 5, 2023, the day before the Blue Diamond loan was set to mature, Dalby, AIM, Sandlot, and Gabb entered into the Financing Facilitation Agreement ("FFA").[135] In addition to the "drag-along" provision,[136] the FFA provided that Tall would replace Jana as a Common Director designee and be appointed Chairman but that the composition of the Board would otherwise remain the same.[137] The parties also agreed that for the term of the FFA, no director could be removed from the board without the unanimous approval of the other four directors.[138] The FFA would terminate when the Company raised a Series B round or, if no Series B round was raised, then on March 31, 2024—approximately six months after it was signed.[139]

---

[134] *E.g.* TT 175:10–23 (Dalby) ("[W]hat was presented to me is that Blue Diamond was going to call their note, which was going to become a situation for default for the company. And the only way that they would extend the note is if they could control who the director would be and take control of the Board. And Spencer[ ] [Tall's] been a friendly on that side for a long time. And so that's what happened.").

[135] JX 95–97; Pre-Trial Stip. ¶ 56.

[136] JX 95 § 2.

[137] *Id.* § 1.

[138] *Id.* § 1(b).

[139] *Id.* § 4.

## H. The Telespire LSA

On November 1, 2023, Gabb entered a Loan and Security Agreement ("LSA") with Zefcom LLC d/b/a Telispire PCA ("Telispire").[140]  The Telispire LSA provided Gabb with a $5 million revolving line of credit,[141] along with the right to "request" an increase to the credit limit by up to $3 million.[142]  Telispire had "sole and absolute discretion" in determining whether to approve the credit limit increase and had no "obligation to do so."[143]

The Telespire LSA also limited Gabb's ability to take on new debt[144] and restricted the Company from changing its senior management, Board structure, or ownership without Telispire's prior approval.[145]  In the event of a default, the LSA required that Gabb "promptly" give Telispire written notice of the default.[146]

---

[140] Pre-Trial Stip. ¶ 62; JX 107 ("Telispire LSA").

[141] Pre-Trial Stip. ¶ 63; Telispire LSA § 2.1.

[142] Pre-Trial Stip. ¶ 64; Telispire LSA § 2.2.

[143] Pre-Trial Stip. ¶ 64; Telispire LSA § 2.2.

[144] Pre-Trial Stip. ¶ 65; Telispire LSA § 6.1 ("Except with respect to Permitted Indebtedness, the Borrower shall not issue evidence of or create, assume, become contingently liable for, or suffer to exist, any other Indebtedness.")

[145] Pre-Trial Stip. ¶ 66; Telispire LSA § 6.9 ("The Borrower shall not permit any changes in its senior management, Board structure or ownership without first consulting [Telispire] prior to any proposed changes and obtaining the [Telispire]'s approval.").

[146] Pre-Trial Stip. ¶ 67; Telispire LSA § 7.2.

## I.    The Attempted Series B Raise

On November 4, 2023, Gabb engaged Moelis & Company ("Moelis") as its investment banker to help secure its Series B round of financing.[147]  Over the five months after the FFA was signed, Moelis targeted over 100 potential bidders.[148]

### 1.    The Capitalization Table Dispute

During this period, the dispute between Dalby and the Preferred Directors and management over the March 2022 options came to a head, as the fundraising process required the Company to have a settled capitalization table.[149]  Throughout the dispute, Tall would strategize with management and the Preferred Directors and then act as the go between with Dalby.[150]  For instance, on February 23, 2024, Tall texted Randle, Cole, and Kastner about a conversation he had had with Dalby, writing, "Dalby didn't take it well.  I might have raised my voice."[151]  Cole and Kastner replied thanking Tall for "being willing to deal" with Dalby, with Kastner using an expletive to describe Dalby.[152]

---

[147] Pre-Trial Stip. ¶ 58; JX 1131 (Moelis Engagement Letter); *see also* JX 98 (Oct. 2023 slide deck on Moelis's proposed scope of engagement).

[148] JX 116 (Moelis company list).

[149] TT 128:25–136:8 (Kastner).

[150] TT 127:15–128:14 (Kastner).

[151] JX 125 at 1.

[152] *Id.*

Two days later, Kastner sent Tall, Randle, Cole, and Mendez a screenshot of an email from Dalby asking to "circle up [r]e cap table."[153]  Randle responded: "Constant games.  We are receiving due diligence questions so we are now within a day or two of these groups asking for cap table, etc.  He's playing with fire."[154]  Tall wrote back, "I think we need to be prepared for basically DEFCON one here guys. . . . We are going to have to disclose to our potential investors, or at least to our bankers, that the ca[p] table is in dispute."[155]  He noted that "[s]hutting down the process is the only thing that scares [Dalby.]"[156]

In contemplating next steps, Kastner suggested that they needed to "weigh carefully whether disclosing [the cap table is in dispute] will kill the series B."[157]  He advised that "[i]f we think it's likely, we have a responsibility to do whatever we can to fix this if Dalby won't sign."[158]  Tall responded: "So Dalby gets what he wants.  No options really granted until financing is completed.  Screws everyone on strike price."[159]

---

[153] JX 127 at 5.

[154] *Id.* at 2.

[155] *Id.*at 3.

[156] *Id.*

[157] *Id.* at 4.

[158] *Id.*

[159] *Id.*

On March 6, 2023, Dalby made a compromise proposal: approving all of the disputed grants while "simply amend[ing] the vesting schedules for [Randle], [Cole] and [Mendez] so that their options would fully vest upon the closing of the Series B financing."[160] After reading Dalby's proposal, Mendez texted in a group chat with Cole and Randle: "Why don't I see anything wrong with Dalby's proposal?"[161] Cole responded: "If Dalby messes anything up along the way and we don't get the [Series] B, then we don't get options."[162] Ultimately, Tall emailed Dalby back, writing that he could not support the proposal because "it will cause us both audit and logistical problems that are too cumbersome to overcome by changing vesting schedules" and "[i]t would be patently unfair to both [Cole] and [Randle] to require revest of these options."[163]

### 2.    Dalby's Fundraising Effort

Under its agreement with Moelis, Gabb was not permitted to directly contact potential Series B investors without Moelis's prior approval.[164] Nonetheless, the Dalbys frequently circumvented Moelis and solicited prospective investors,[165] risking

---

[160] JX 134 at 1.

[161] JX 135 at 1.

[162] *Id.*

[163] Id.

[164] JX 1131 § 4(d); *see also* JX 322 (text from Cole stating: "We can't breach our agreement with Moelis. Allowing Dalby to pitch would do that.").

[165] *See* JX 143; JX 1114; JX 321; JX 817; JX 1100.

33

violations of securities laws.[166]  On September 16 2024, Clayton sent Dalby a letter instructing him to cease all outreach to potential investors.[167]  The Company did not secure a Series B round of financing.[168]  The FFA expired on March 31, 2024.[169]

## J.    Dalby Replaces Tall with Jana

On Friday May 3, 2024, over a month after the FFA's termination date, Dalby sent Clayton a written consent removing Tall from the Board and appointing Jana.[170]  Dalby also blocked Tall's phone number.[171]  The next Monday morning, Randle alerted each of the Company's directors other than Dalby, writing "[Dalby] is making yet another attempt to remove a board member in order to replace with his wife, Jana.

[166] *See* JX 339 (Cease and Desist Letter) ("Several weeks ago, when the Company got you involved the process that needed to be followed was clearly outlined to you and the Company directed you to follow that process. . . .  One such instruction you were given is that prior to speaking to an investor, you needed to notify Moelis and provide Moelis with the potential investors['] name and other relevant information so Moelis could confirm the potential investor was accredited or an otherwise qualified investor.  You were also informed that failure to comply with applicable securities laws can place the Company at risk.").

[167] *Id*. ("You are directed to immediately cease all discussions with any and all parties you have contacted with regards to financing and are unauthorized to initiate any future discussions."); *see also* JX 900 (Moelis's feedback on Clayton's draft Cease and Desist Letter).

[168] Pre-Trial Stip. ¶ 59.

[169] *Id*. ¶ 60.  After the FFA expired, two potential investors, Cellular South, Inc. d/b/a C Spire ("C Spire") and SilverBox Capital ("SilverBox") expressed interest in Gabb's Series B round.  *Id*. ¶¶ 78–84.  Ultimately, Gabb did not move forward with either C Spire or SilverBox. JX 305 at 1; Pre-Trial Stip. ¶ 84.

[170] Pre Trial Stip. ¶ 68; JX 146 at 2 (Written Consent).  Zolman had interviewed Jana when he first joined the Board (JX 78) but by May 7, 2024, explained "I would not make the same recommendation today."  JX 1321; JX 816.

[171] *See* JX 223 (July 4, 2024 email from Tall to Dalby, writing "You say you're happy to talk with me and yet you still have me blocked.  Both text and calling.  That is not the way a serious business person or fiduciary operates.")

This time it is our Chairman, Spencer."[172]  Explaining his concern, Randle added "[o]ne of the key parts of our pitch has been that we now have a stable board that is ready to review term sheet(s)."[173]

That evening, Bowman sent Randle, Cole, and Clayton his initial thoughts on Tall's removal and Jana's appointment.[174]  Bowman wrote: "Given the stockholder consent . . . and the fact that the Financing Facilitation Agreement has expired, it would be difficult to successfully argue that Tall has not been removed from the board."[175]  But, Bowman shared that Jana's appointment was "likely improper" because, among other things, Jana "lack[ed] the proper qualifications" so "her appointment to the board would be a violation of the Voting Agreement."[176]

The next day, Tall texted Randle: "David Kastner called me tonight.  Suggested that the [Telispire LSA] has a requirement that no changes in management or board structure can take place without their approval.  That might be the ultimate leverage."[177]  A little later, Randle wrote to Tall: "Isn't board structure different than

---

[172] JX 147 at 1.

[173] *Id.* at 2.

[174] JX 148 at 1–2.

[175] *Id.* at 2.

[176] *Id.*

[177] JX 149 at 1.  When testifying, Kastner could not "confirm or deny" if he came up with the idea.  TT 143:8–16 (Kastner).

board members? I see structure as going from 5 to 7 or 5 to 3. Or changing common to preferred, etc."[178]

Later that day, Bowman emailed Neal Bakare,[179] another attorney at Gabb's outside law firm, Foley & Lardner LLP ("Foley"), who specializes in loan security agreements and was involved in the Telispire LSA negotiations.[180] Bowman asked if Tall's "purported removal and replacement" would violate Section 6.9 of the Telispire LSA, "which prohibits Gabb from permitting any changes to its 'Board structure' without first consulting [Telispire] and obtaining [Telispire's] approval."[181] Bakare replied, writing that Section 6.9 was "not a hot topic in the negotiation" and that he "d[idn't] recall specifically discussing this provision with [Telespire's counsel]."[182] In Bakare's view, Tall's removal "would violate 6.9 as a *technical matter* only under the most strained reading" since the provision "says 'structure' not 'membership.'"[183] Bakare explained that "there is a distinction among practitioners between so-called

---

[178] JX 149 at 2.

[179] JX 918.

[180] TT 619:10–16 (Bowman); *see* JX 920.

[181] JX 920 at 2; *see also* JX 107 § 6.9.

[182] *Id.*.

[183] *Id.* (emphasis in original); *see also* JX 921 at 2 ("Section 6.9 speaks to 'structure' and not 'membership.' An argument can be made that a change to the 'Board structure' is something more significant than simply removing and replacing a director (e.g., increasing or decreasing the number of board members or the manner in which they are elected).").

36

technical defaults and payment defaults with payment defaults being considered more real."[184]

Nevertheless, Bowman did see "potential strategic advantage in taking the position in conversations with Dalby that his actions constitute, or could constitute, an event of default (as this could, perhaps, cause him to reconsider his current course)."[185] Approximately two weeks later, that is exactly what Kastner did over an email exchange with Dalby's attorney, Dan Harris.[186] When Harris wrote to Kastner that Section 6.9 did not "provide Telispire a consent right over changes in director composition on the Board,"[187] Kastner responded, stating "[i]t seems that there are differing view on 'changes in board structure'—which is not surprising given the lack of specificity."[188] Then, seemingly in contradiction to what Bakere had told Bowman just a few weeks ago, Kastner wrote: "What's concerning is that Telispire stated in the extension process that their intent included a change in the composition of the board, and that it is included because of the previous instability of the board."[189]

---

[184] JX 920 at 2.

[185] JX 921 at 2–3.

[186] *See* JX 155.

[187] *Id.* at 2.

[188] *Id* at 1.

[189] *Compare* JX 920 (email from Bakare, the attorney involved in the Telispire LSA negotiations stating Section 6.9 was "not a hot topic in the negation" and "I don't recall specifically discussing this provision with [Telispire's counsel]") *with* JX 155 (email from Kastner to Dalby's counsel, expressing that "Telispire stated in the extension process that their intent included a change in the composition of the board").

37

On June 6 and June 10, 2024, Randle held calls with Telispire to provide updates on "potential changes to [Gabb's] Board of Directors" and to "consult with Telispire on what Section 6.9 . . . requires."[190]  On June 11, after the calls with Randle, a Telispire representative sent Randle an email, writing:

> As a current lender to Gabb we are highly focused on the business plan that we have agreed upon . . . .  Following this business plan will ensure that we are properly repaid by the maturity date of our loan. . . .A change in the Board at this point, without further understanding the effects of the change on the plans we have agreed to, would likely be viewed by [Telispire] as an event of default.  Boards rarely change composition with a goal of maintaining a current business plan.[191]

It is unclear what Randle communicated to Telispire on the calls and whether he pushed Telispire to declare a default to put pressure on Dalby as Cole had with Blue Diamond just seven months before.  In any event, when Gabb sought to access additional funds under the LSA "to . . . cover inventory for the upcoming sales season,"[192] Telispire demanded that Gabb's Board "[1] Reinstate the board as it was with Spencer Tall as Chairman, [2] Agree to no longer remove common board members through the end of the NRTC/Telispire debt terms, [and] [3] Unanimously approve the additional debt to be used for back-to-school inventory that was already

---

[190] JX 167 at 3.

[191] *Id.*

[192] JX 175.

38

approved by the board last fall."[193] Dalby refused to reinstate Tall, and Telispire did not lend Gabb additional funds.[194]

### K. "Project Exitus"

On July 8, 2024, Bowman sent Randle, Cole, and Clayton a document titled "Gabb - Project Exitus - Strategic Plan & Roadmap - Confidential" ("Project Exitus").[195] The document set forth a "Strategic Plan & Roadmap" consisting of "various potential actions Gabb Wireless, Inc. . . . under the direction of the Executive Committee and the Company's management team, may be able to take to help mitigate and/or resolve certain long-standing disputes between the Company and its founder, Stephen Dalby . . . which involve ongoing disruptive behavior and actions by [Dalby] that are irreparably harming the Company."[196] The actions described in the Project Exitus Strategic Plan & Roadmap included, among other things: (1) establishing an "Executive Committee" of the Board; (2) removing Dalby from the Board for cause by vote of the stockholders; (3) enforcing a $25,000 loan made by the Company to Dalby; and (4) helping former Common Director Anne Butler enforce an approximately $400,000 loan against Dalby.[197]

---

[193] Pre-Trial Stip. ¶ 69.

[194] *E.g.*, JX 309 at 2.

[195] Pre-Trial Stip. ¶ 94; JX 237.

[196] JX 237 at 3.

[197] *Id.* 3–8.

The document also included "Comments" and "Next Steps" for each of the actions.[198] Regarding Jana's appointment to the Board, the Project Exitus roadmap included the following "Comment[]":

> Thus far, Gabb has taken the position that it does not recognize Stephen's purported appointment of Jana to the Board on May 3, 2024. . . . We have discussed Gabb's position with [Delaware Corporate Counsel] who was recently engaged as the Company's Delaware counsel. We are looking into whether continuing to dispute Jana's purposed [sic] appointment is a viable option, even if only to distract Stephen while other aspects of the Plan are implemented.

The "Comments" section next to establishing an Executive Committee read: "This has been implemented. The Executive Committee was approved by a majority of the Board at the July 2, 2024 Board meeting."[199]

Foley billed all work relating to Project Exitus and Dalby's removal—and, later, AIM's note conversion—to Gabb.[200]

### 1. The July 2, 2024 Board Meeting

Approximately two weeks before circulating the Project Exitus Strategic Plan & Roadmap, Foley had contacted Delaware Corporate Counsel ("DCC") to serve as Gabb's counsel for Delaware law matters related to Dalby.[201] On June 25, 2024, Foley asked DCC to provide "a sense of the timing and an estimate of fees" for "[h]elping

---

[198] *Id.*

[199] *Id.* at 3.

[200] Pre-Trial Stip. ¶¶ 141–146; JX 313; JX 334; JX 356; JX 398; JX 501; JX 608; JX 609.

[201] Pre-Trial Stip. ¶ 90; *see also* JX 180 (June 24, 2024 email from Foley describing "Gabb" as Foley's client and Dalby and Jana as "Adverse Parties.").

the company prepare and run a stockholder consent solicitation process for the purposes of removing a director."[202]   That same day, Foley also emailed DCC background on Gabb and Dalby and a list of objectives.[203]   In the background section, Foley wrote, among other things, that the Series B had stalled "primarily due to Dalby's erratic and chaotic behavior," and that Dalby had, without notice, removed Tall, the Company's Chairman, during the Series B raise, and sought to appoint his wife, who "has no qualifications to be a director" in Tall's place.[204]   The list of objectives included: removing Dalby per Section 1.4(a) of the Voting Agreement, suing Dalby for breach of fiduciary duty and breach of the Settlement Agreement, conducting a campaign to obtain majority stockholder approval to remove Dalby from the Board, and conducting a raise from insiders to dilute Dalby.[205]

On the morning of July 1, 2024, Randle texted in a group chat with Mendez, Kastner, and Zolman, writing that "we unfortunately need to call an emergency board meeting for tomorrow to secure replacement debt because Dalby has blocked the Telispire option."[206]   There was, in fact, an emergency.   Two weeks before, Randle had

---

[202] JX 184 at 1.

[203] JX 186.

[204] *Id.* at 1.

[205] *Id.* at 2.

[206] JX 194 at 2.   When Dalby accused Randle of notifying the other directors a week in advance of the Board meeting, Randle misleadingly replied: "All board members were notified at the same time by an email that was sent by me on Monday July 1 @ 12:07pm (MT)."   JX 225.

41

emailed Dalby flagging that, without the additional Telispire debt, the Company's "cash balance will go negative on July 3rd."[207] Randle asked Mendez, Kastner, and Zolman their availability for a Board meeting on July 2 before inviting Dalby.[208]

After confirming that the Preferred Directors and Zolman could attend, Randle emailed the full Board a notice of an "urgent" July 2, 2024 Board meeting "to immediately address" Gabb's "current debt position."[209] Randle stated: "I am inviting Jeff Mendez, David Kastner, Steve Zolman, and Stephen Dalby as official board members."[210] He explained, "[w]e have stated in writing that we do not acknowledge Jana Dalby as an official board member . . . . Jana is welcome to attend as a guest, if interested."[211] Randle's notice of the Board meeting did not mention establishing an Executive Committee.[212]

Soon afterward, Foley emailed DCC: "We spoke with Gabb and they would like to formally engage you."[213] Foley also indicated that "Gabb noticed a board meeting

---

[207] JX 225 at 3.

[208] JX 194 at 2.

[209] JX 193; Pre-Trial Stip. ¶ 91.

[210] JX 193.

[211] *Id.*

[212] Pre-Trial Stip. ¶ 92.

[213] JX 195 at 1.

42

for tomorrow" and sought to touch base with DCC for guidance on a few points in advance of the meeting.[214] All of DCC's work was billed to Gabb.[215]

### a. Zolman, Kastner, and Mendez Secretly Establish an Executive Committee

Shortly before the scheduled Board meeting, Clayton emailed the Preferred Directors, Randle, and Cole stating: "I just got off a call with Foley regarding the executive committee."[216] Clayton attached a draft Board resolution to create an Executive Committee of the Board.[217] Per the resolution, Zolman, Mendez, and Kastner would comprise the Executive Committee.[218] No one sent the resolution to the Dalbys.

The Board met via GoogleMeet.[219] The Dalbys had not advised the Board or Gabb's management that they would be traveling to Hawaii for a pre-planned family trip.[220] Both Stephen and Jana joined the Board meeting for approximately twelve

---

[214] *Id.*

[215] Pre-Trial Stip. ¶¶ 147–148, 150, 156, 158–59; JX 583; JX 806; JX 594; JX 771–72.

[216] JX 204 at 1.

[217] *Id* at 2.

[218] *Id.*.

[219] JX 245 at 3 (Draft July 2, 2024 Board Meeting Minutes).

[220] Pre-Trial Stip. ¶ 93; *see also* JX 216 at 1 (July 2, 2024 email from Dalby stating "my family and I are in the air as we already had travel plans arranged"); JX 225 at 1 (July 5, 2024 email from Randle to Dalby, writing, "When you received the email – if you would have let the board know that you had travel plans – we would have made an adjustment to accommodate your schedule. You did not notify us until shortly before the meeting.").

minutes from their flight to Hawaii until a flight attendant required them to disconnect.[221] Draft Board meeting minutes prepared by Foley, but never sent to the Dalbys, stated that Zolman, Mendez, and Kastner established the Executive Committee after the Dalbys left the meeting.[222] No one told the Dalbys about the Executive Committee.[223] That was deliberate.[224]

### b. Kastner and Mendez Approve the Original AIM Note

Although Randle did not let the Dalbys know that the Board would consider forming an Executive Committee at the July 2, 2024 Board meeting, he did send notice that Gabb's "current debt position" would be discussed at the meeting.[225] And Randle shared draft bridge notes with Dalby shortly before the meeting, explaining "[t]he business has immediate financial obligations that need to be met this week."[226]

---

[221] Pre-Trial Stip. ¶ 93.

[222] JX 245 at 5 ("*Executive Committee.* Mr. Kastner next discussed the creation of an Executive Committee of the Board ("**Executive Committee**"). The Board discussed the disruptive, erratic and antagonistic actions of the Company's founder and current member of the Board, Stephen Dalby, which have impeded the Board form performing its necessary functions and are irreparably harming the Company. The Board discussed the benefit of creating the Committee and providing it with the authority to meet, discuss and take any and all actions allowed under Delaware law. . . .Upon motion duly made by Mr. Zolman and Seconded by Mr. Mendez, the Board approved by a majority the resolutions [creating the Executive Committee], with Messrs. Kastner, Mendez and Zolman, constituting all of the directors then in attendance at the meeting, voting in favor." (emphasis in original)).

[223] TT 34:17–19 (Clayton); TT 136:14–17 (Kastner); TT 522:10–13 (Randle); TT 597:10–13 (Mendez); TT 616:2–17, 617:1–19 (Bowman).

[224] TT 616:2–17, 617:1–19 (Bowman); TT 136:14–17 (Kastner).

[225] JX 193.

[226] JX 214 (email from Randle to the Board attaching drafts of the notes).

After the Dalbys dropped off the call, Kastner, Mendez, and Zolman voted to approve $4 million in AIM and Sandlot convertible notes, at a 22% interest rate.[227] The notes were characterized as "bridge financing" and a "bridge loan."[228]

Later that day, Kastner texted Cole: "It doesn't do us any good to have the conversion component of the debt deal. We would simply [be] diluting ourselves for the most part. Essentially getting nothing in return for the investment."[229] What Kastner was concerned about was the Settlement Agreement's No Additional Dilution provision.[230]

So the next day, Kastner, Mendez, and Zolman—acting as the Executive Committee—voted to adjust the terms by removing the conversion feature and agreed to a $1.5 million AIM promissory note (the "AIM Note") instead of the original AIM and Sandlot convertible notes.[231]

On July 5, 2024, Randle emailed Kastner and Cormac Murphy—a member of AIM's investment committee who has sole investment decision-making authority for the AIM funds and negotiated the note on behalf of AIM.[232] Randle wrote: "Sending

---

[227] Pre-Trial Stip. ¶ 70; JX 421 at 35—37.

[228] JX 421 at 15.

[229] JX 203 at 2.

[230] Id. ("[W]e cannot come in with a non-[Series B] round, or we just dilute ourselves, per the settlement agreement.").

[231] Pre-Trial Stip. ¶ 72; JX 224.

[232] JX 1324.

45

a big THANK YOU for stepping in to help us make the inventory payment his week. After exhausting all other options, we were in a tough spot and I sincerely appreciate the support."[233]

### c. The Board Approves the Revised AIM Note

On July 26, 2024, Telispire sent Gabb a reservation of rights letter asserting that the AIM Note was "prohibit[ed]" under Section 6.1 of the LSA and demanding that it be subordinated to Telispire's loan.[234] The next day, Randle circulated Telispire's letter to the Board and asked the Board to approve a subordinated version of the AIM Note that added the conversion feature back in.[235]

On July 31, 2024, following a discussion with Murphy and Kastner, the Dalbys agreed to approve the AIM Note as revised.[236] Murphy subsequently emailed the Dalbys, Randle, Cole, Mendez, and counsel a draft of the amended AIM Note and explained the note's key terms, including what the conversion process would look like.[237]

---

[233] *Id.*

[234] Pre-Trial Stip. ¶ 73; JX 254 at 5–8.

[235] Pre-Trial Stip. ¶ 74; JX 272.

[236] Pre-Trial Stip. ¶ 75; JX 272 at 1 ("Jana and I agreed to the terms of the convertible note that was put forth to us earlier today on our call with AIM (Cormac and David). We do not agree that the company should go into default.").

[237] JX 291 at 1 (Murphy explained how a conversion under 2(a) would work, stating: "Basically, the $1.5M Note will be convertible at a maximum valuation of $80 million with an option to purchase an additional $1M at the same price upon conversion. The note also grants the option AIM Co-Invest to convert any convertible notes at the same terms unless

46

The revised AIM Note provides for two options for conversion: Section 2(a) and Section 2(b).[238] Section 2(a) allows AIM Ventura to elect to convert in its "sole discretion" after thirty days. Once AIM Ventura elects to convert, the AIM Note provides that "the Company shall convert the outstanding principal amount of [the AIM Note] and all accrued and unpaid interest . . . into that number of shares of Optional Conversion Preferred Stock of the Company . . . with a further optional conversion to common at a ratio of 1:2."[239] Upon conversion, AIM Ventura can also elect to purchase up to $1 million worth of additional shares, and Gabb is required to offer the AIM Co-Invest Entities the option to convert as well.[240] If the AIM Co-Invest Entities exercise their option to convert, all other debt holders can convert at the same terms.[241] Section 2(b) allows AIM to convert following a Series B round of financing.[242]

Section 2(c) of the AIM Note lays out the procedure for conversion.[243] In the case of a conversion under Section 2(a), the Company is "not required to issue or

it is part of an equity round. While the option is granted to AIM Co-Invest, all applicable convertible debt could participate, not just AIM's portion.").

[238] JX 226 § 2.

[239] *Id.* § 2(a).

[240] *Id.*

[241] *Id.*

[242] *Id.* § 2(b).

[243] *Id.*

deliver the capital stock" until "the Company has taken all corporate action required to be taken by the Board and the Company's stockholders, including, without limitation, the filing of an amended certificate of incorporation with the Delaware Secretary of State authorizing the Optional Conversion Preferred Stock."[244] The AIM Note defines "Optional Conversion Preferred Stock" as "shares of preferred stock of the Company styled 'Series B Preferred Stock' issued to [AIM] having the identical rights, privileges, preferences and restrictions as shares of the Company's Series A Preferred stock . . . ."[245] If the Company fails to issue the Optional Conversion Preferred Stock within fifteen days of receiving notice of AIM's election to convert, a "Default Interest Trigger Event" results.[246] In that case, the interest rate of the AIM Note increases from 22% per annum to 30% per annum.[247]

At trial, Murphy testified that he wanted Dalby to understand the two conversion options under Sections 2(a) and 2(b) of the AIM Note.[248] Murphy testified that he explained how the conversion would work in detail, including that conversion

---

[244] *Id.* § 2(c).

[245] *Id.* § 5(q)(x).

[246] *Id.* § 2(c).

[247] *Id.* at 1.

[248] TT 460:7–20 (Murphy).

under Section 2(a) was a "more dilutive path, triggering the Series B by itself."[249] Nothing in the record supports Murphy's testimony.

The Board executed an action by written consent to ratify the amended and restated version of the AIM Note, and Dalby, along with AIM and Sandlot approved the AIM Note on behalf of a majority of Gabb's stockholders.[250] Both the Board consent and the stockholder consent included language acknowledging that Cole, Kastner, and Mendez "may personally benefit from the Company entering into the [AIM Note]."[251]

### 2. Gabb Management Green Lights Removing Dalby for Cause

On July 8, 2024, the same day as Bowman shared the Project Exitus Strategic Plan & Road Map with Gabb's management, Foley emailed DCC: "[w]e have the green light from Gabb to proceed with the stockholder consent solicitation to remove Stephen [Dalby] for cause."[252] The email further noted "Gabb wants to proceed with this action as soon as possible."[253]

---

[249] TT 459:18–460:20 (Murphy). *But see* JX 642 (Jan. 17, 2025 email from Jana, writing: "I am confused why no one will answer questions about how the conversion will honor the Settlement Agreement's anti-dilution provision that Gabb, AIM, Sandlot, and [Cole] all agreed to.") *and* JX 624 at 2.

[250] Pre-Trial Stip. ¶¶ 76–77; JX 284 (July 2024 Unanimous Board Consent); JX 286 (July 2024 Stockholder Consent).

[251] JX 284 at 1; JX 286 at 1–2.

[252] JX 238 at 2.

[253] *Id.* at 4.

About a month later, on August 7, 2024, DCC emailed Foley a draft Confidential Information Statement ("CIS").[254] In the draft, "the bases for the 'for cause' removal had been left blank."[255] DCC noted in the cover email that "[a] stockholder of the company, as opposed to the company, should circulate the information statement and solicit consents from other stockholders. The company should be careful in its discussions with the soliciting stockholder."[256]

On August 16, 2024, Foley emailed Gabb's Delaware litigation counsel, Landis, Rath & Cobb LLP ("LRC"), attaching so-called "Project Exitus Important Documents."[257] These documents included, among other things, the Company's formation documents and the November 7, 2022 letter detailing Dalby's breaches of the Settlement Agreement and his fiduciary duties.[258] Gabb was billed for all of LRC's work.[259]

A few days later, on September 12, 2024, Foley emailed DCC and LRC a draft "written consent" for Dalby's removal that "[Foley] had started preparing a while back."[260] In the cover email, Foley outlined the "Reasons for Removal," which

---

[254] JX 306; Pre-Trial Stip. ¶ 96.

[255] JX 306.

[256] *Id.* at 1.

[257] Pre-Trial Stip. ¶ 98; JX 314.

[258] JX 314.

[259] Pre-Trial Stip. ¶¶ 149, 151, 152, 157, 159; JX 588; JX 403; JX 495; JX 617; JX 772.

[260] JX 335 at 1.

included, among others, causing Gabb to breach the Telispire LSA, refusing to approve an amendment to the Telispire LSA that would have allowed the Company to access additional funds, and breaching the Settlement Agreement.[261]

In late September, Clayton presented a slide deck to the Executive Committee entitled "Legal Strategy."[262] The first slide read: "Preferred Path: [John] Rampton buys out 80% of existing Dalby shares."[263] The third slide was titled "Legal Strategy – Strategy Questions."[264] There were three questions listed on the page. First: "Do we tell Dalby we're doing stockholder consent in x days to push secondary?"[265] Second: "AIM Ventura note diluting Dalby?"[266] And, third: "Who else may be willing to exercise options?"[267]

On October 3, 2024, DCC emailed Foley and LRC a draft proxy for a stockholder solicitation for Dalby's removal.[268] Approximately two weeks later, DCC circulated a draft of the alleged reasons for Dalby's removal to be included in a CIS

---

[261] *Id.*

[262] TT 46:24–47:7 (Clayton); Pre-Trial Stip. ¶ 100; JX 344.

[263] JX 344 at 1.

[264] *Id.* at 3.

[265] *Id.*

[266] *Id.*

[267] *Id.*

[268] Pre-Trial Stip. ¶ 102; JX 350.

to LRC and Clayton.[269]  This draft similarly referenced, among other things, breaches of the Telispire LSA and the Settlement Agreement, as well as violations of Moelis's procedures.[270]

### 3.    Clayton Hires KRDL to Investigate the Dalbys

In October 2024, Clayton, on behalf of the Company, engaged KRDL Group LLC ("KRDL") to investigate the Dalbys.[271]   KRDL invoiced Gabb for the investigation.[272]  Clayton testified that the Company hired KRDL after the Dalbys' neighbor in Rexburg, Idaho, emailed the Company about a protection order she had sought against Dalby for allegedly stalking her family and minor children.[273]  She described stalking and other unnerving behavior, as well as an incident at her church where Dalby accosted her husband and lunged at him before being pulled away by Jana and his daughter.[274]  In part because of the altercation, The Church of Jesus Christ of Latter-day Saints prohibited Dalby from setting foot on church property or

---

[269] Pre-Trial Stip. ¶ 105; JX 367 at 11–12.

[270] JX 367 at 11–12.

[271] Pre-Trial Stip. ¶ 101; *see also* JX 352 (Oct. 4, 2024 email attaching KRDL's form NDA).

[272] Pre-Trial Stip. ¶¶ 152, 154–55; JX 357; JX 400; JX 418.

[273] TT 9:10–17 (Clayton) ("The company had received an email from a concerned mother saying … that they had sought a protective order against Mr. Dalby for her four minor children and herself for stalking and threats."); JX 1108 (neighbor's email to Gabb); *see also* JX 385 at 5–11 (protection order dated Aug. 12, 2024).

[274] JX 1108; *see also* JX 246 (text exchange between Gabb's VP of Marketing, Lance Black, and Gabb employee about the incident).

contacting church officials for a minimum of one year.[275]  According to the neighbor's

email, she had reached out to Gabb after Dalby's counsel led her to believe that the

Company would sue her in retaliation.[276]  The neighbor also expressed concern that

"the founder of a company that pushes safety for children is the center of so much

chaos and risk of safety for my family."[277]  She explained:

> [A]s I read Gabb's stated mission and some of the aims:  (1) protect kids;
> (2) connect families; and (3) empower parents, I was alarmed by the
> disconnect between your founder and what it seems the company stands
> for and wonder how many other families in this small town feel similarly
> disillusioned after concerning experiences with Dalby?[278]

Randle forwarded the neighbor's email to Tall.[279]  Tall wrote back: "Honestly,

this is much less concerning than I thought it would be.  It is a personal dispute

---

[275] JX 1108 ("My understanding is that the legal counsel for our church took independent action against Dalby to prohibit his attendance, not only because of what happened to our family alone, though I am not apprised fully of all the details.  I know only that I was affirmatively notified that I did not need to worry that Dalby would be in our church building again after the incident where he verbally assaulted my husband and physically lunged towards us as he did."); JX 1107 (July 19, 2024 letter from The Church of Jesus Christ of Latter-day Saints).  The letter from The Church of Jesus Christ of Latter-day Saints provided after "a minimum of twelve months" Dalby could "discuss" "potentially lifting some or all of the restrictions."  JX 1107.  Seemingly, Gabb's management and other directors did not receive a copy of the letter until early December, when the letter was anonymously "dropped off" at Cole's doorstep.  JX 471 at 4.  On an email thread with Cole and Clayton, Randle responded to the letter, writing: "Religions rarely ban someone.  They reprimand and then immediately let the individual return to seek improvement or forgiveness.  In this case, it's very clear.  Don't call us . . . we'll call you.  For it to get to this point means he did something or several things that were of serious concern."  JX 471 at 3–4.

[276] JX 1108.

[277] *Id.* at 4.

[278] *Id.*

[279] JX 330.

53

between neighbors and him invoking the name of Gabb requires the company to say he doesn't represent the company. This . . . doesn't give us much to act on."[280]  Tall advised Randle to focus on having Rampton acquire Dalby's Gabb shares instead, stating:

> Let's keep our focus on that getting completed.  I am in no way discounting [the neighbor's] terror or frustration.  We all know who this guy is.  However, . . . nothing he has done rises to anything beyond harassment.  He's a creep and a weirdo, but we already knew all of that.[281]

On November 4, 2024, Clayton emailed Randle and Cole KRDL's "preliminary" report (the "Preliminary Report").[282]  The Preliminary Report tied the Dalbys to disparaging reviews of the Company published on Glassdoor.[283]  The Preliminary Report also identified several domestic incidents that required intervention by the police.[284]  In particular, the Preliminary Report highlighted several publicly available police reports which described "sheriff's deputies . . . frequent[ing] the Dalby home"

---

[280] *Id.*

[281] *Id.*

[282] Pre-Trial Stip. ¶ 106; JX 382.

[283] JX 382 at 3–12.

[284] *Id.* at 19–27.

and "officers visit[ing] the property at all hours of the night several times a week in June and July."[285]  None of the police reports resulted in arrests.[286]

The Preliminary Report was caveated, and included disclaimers, such as: "The information provided herein is intended solely for general informational purposes and should not be construed as legal, forensic, or adjudicatory advice."[287]

### 4.  The Stockholder Solicitation

On November 7, 2024, Kastner emailed Dalby, stating that he was providing "formal notice that Gabb . . . and its principal stockholders are initiating the process to remove you from the Company's Board . . . for cause."[288]  The email was signed by both Kastner and Mendez and included an attachment titled "RECITATION OF REASONS FOR THE REMOVAL OF STEPHEN DALBY AS A DIRECTOR FOR CAUSE."[289]  The stated reasons for removing Dalby fell into five categories: (1) "Brand Reputation Damage"; (2) "Board Instability"; (3) "Breaches of Telispire Credit

---

[285] JX 1108 at 2; JX 382.  Plaintiffs argue that police reports are, for evidence purposes, considered unreliable and hearsay.  Dkt. 156, Pls. Post-Trial Opening Brief ("Pls.' OB") at 63. Because I need not reach the parties' disputes over the substance of the reports, I do not rely on them for purposes of this ruling.

[286] TT 649:13–24 (Jana).

[287] JX 382 at 4.

[288] Pre-Trial Stip. ¶ 109; JX 394 at 1.

[289] JX 394 at 3.

Facility"; (4) "Recklessness and Malfeasance in Performance of Duty"; and (5) "Other Breaches of Settlement Agreement and also the [Investors' Rights Agreement]."[290]

Six days after receiving the notice, on November 13, 2024, Dalby replied, challenging Kastner's statement that "'Gabb . . . [is] initiating the process to remove'" him from the Board.[291] Dalby explained that Kastner's email "reflect[ed] a misunderstanding of Gabb's governance" since "Gabb's business and affairs are managed by its Board of Directors," and "the Board can **only** take action (1) at a Board meeting or (2) if <u>all</u> Board members consent in writing . . . ."[292] Dalby requested "any good-faith basis for asserting that Gabb has been validly authorized to send any solicitation to stockholders in an effort to remove" him.[293]

Foley sought both DCC and LRC's feedback on Kastner's response.[294] The next day, DCC drafted a reply to Dalby's email.[295] DCC recommended that Kastner reiterate that there would be a stockholder solicitation for Dalby's for cause removal and the deadline for Dalby to submit his prepared response.[296] LRC weighed in as well, advising that Dalby's email was a "set up" and an attempt to establish that "the

---

[290] *Id.* at 3–5.

[291] JX 410 at 3 (alteration in original); Pre-Trial Stip. ¶ 110.

[292] JX 410 at 3 (emphasis in original).

[293] *Id.* at 4.

[294] JX 404 at 4.

[295] *Id.* at 3.

[296] *Id.*

process being pursued is illegitimate to create a claim that the Board and other directors are acting in bad faith."[297]  In response, DCC suggested that perhaps Kastner explain that the Preferred Directors are acting as an Executive Committee of the Board, but noted that "I know that we omitted reference to the Executive Committee to avoid telling him about the committee."[298]  Ultimately, when Kastner replied to Dalby, he did not reference the Executive Committee.[299]  Three days later, on November 17, 2024, Dalby responded, writing:

> I understand from this correspondence that you now agree that Gabb is not soliciting my removal, and you will not be representing that Gabb is soliciting my removal or that Gabb has a view on the matter – and will not be using Gabb resources (including Company counsel) to do so.  If that is not right, please let me know **immediately**.[300]

No one responded to Dalby or otherwise informed him that Company resources had in fact been, continued to, and would continue to be used for his removal.[301]

On November 15, 2024, Dalby's Idaho counsel emailed Foley about the neighbor's protective order being cited as one of the reasons for Dalby's removal.[302] The attorney explained that because the protective order had been stipulated to, it evinced "no admission of wrongdoing by Mr. Dalby" and was based on "allegations"

---

[297] *Id.* at 2.

[298] *Id.* at 1.

[299] JX 410 at 2.

[300] *Id.* at 1 (emphasis in original).

[301] TT 108:23–109:1, 147:10–148:19 (Kastner); (Clayton) Dep. 193:4–195:24.

[302] JX 408.

that "would have been rejected" if adjudicated.[303] The attorney advised that he would view the inclusion of information relating to the protective order in the CIS as "extortion" under Delaware and Idaho law.[304] Ultimately, information about Dalby's dispute with his neighbor was not shared with stockholders to justify his removal.[305]

### 5. Management Asks Blue Diamond to Be the "Nominal Sender"

On November 14, 2024, the day after Dalby flagged that the Company could not solicit his removal, DCC emailed Gabb management, Foley, and LRC: "We will need to confirm that Blue Diamond will be the nominal sender of the solicitation statement."[306] Five days later, after speaking with Cole,[307] Ball provided an internal status update at Blue Diamond, writing Gabb's "founder issues are coming to a head" and that AIM and Sandlot "are looking to send out a shareholder consent/agreement request to remove Stephen Dalby from the board."[308] Ball added that it "sounds like [Dalby] has some police issues up in Idaho and other damaging items happening."[309]

---

[303] *Id.* at 1.

[304] *Id.* at 2.

[305] TT 57:4–10 (Clayton); *see* JX 630 (the CIS sent to stockholders).

[306] JX 407 at 1.

[307] TT 363:3–367:21 (Ball) (explaining that all of the updates contained in the email are from a conversation with Greg Cole).

[308] JX 417 at 1.

[309] *Id.*

He also informed the Blue Diamond team that AIM and Sandlot had asked Blue Diamond to take the lead on the effort to remove Dalby from the Board since Gabb's Delaware counsel had recommended "hav[ing] a separate shareholder be the lead on the consent/agreement to remove Dalby from the board."[310] Ball explained, "[r]eally just they'll say Blue Diamond is who is initiating this action instead of AIM or Sandlot so it's a separate party showing sufficient frustration at the situation as to take an action instead of the ones that have already previously made motions against [Dalby]."[311]

In the same email, Ball also provided an update on the plan to dilute Dalby using convertible notes, writing: "The intent . . . is to dilute Dalby sufficiently to be able to remove him from the board and render him as just another common stockholder [sic] he'd be diluted to low 20%'s."[312] He explained that Preferred Directors and management "acknowledge" that the note conversion would also dilute all non-participating stockholders but stated it "needs to be done both for the Dalby situation and the [Company's] need for bridge cash."[313]

---

[310] *Id.*

[311] *Id.*

[312] *Id.*

[313] *Id.*

On December 2, 2024, Clayton emailed DCC and LRC: "It looks like we/Blue Diamond are going to go forward with the stockholder consent."[314] Four days later, Clayton emailed Gabb's management and outside counsel, confirming that "[a]fter lots of internal discussion, and advice from our advisors, Blue Diamond is ready to move forward with the shareholder consent to remove Dalby."[315] She added, "We'd like to proceed asap."[316]

The next week, on December 9, 2024, DCC emailed Foley stating that Randle and Clayton had a call with Blue Diamond confirming that Blue Diamond would send Dalby a statement of purported reasons for removal.[317] That same day, DCC emailed Gabb management, Foley, and LRC "clean and marked copies of the information statement."[318] This CIS listed "Blue Diamond" as the soliciting stockholder.[319] DCC circulated multiple iterations of the draft CIS that day.[320] And Clayton shared a draft email, that was reviewed by Gabb's counsel, for Blue Diamond to send to Dalby.[321]

---

[314] JX 450.

[315] JX 467 at 1.

[316] *Id.*

[317] Pre-Trial Stip. ¶113; JX 471 at 1 ("[Randle and Clayton] had a call with Blue Diamond and Blue Diamond is going to send Dalby the reasons section and give him 48 hours to prepare a response statement and see what Dalby says.").

[318] JX 477 at 1.

[319] *Id.* at 3.

[320] *E.g.*, JX 478.

[321] JX 470; JX 472; JX 474; JX 479.

The next day, Ball sent the email to Dalby.[322]  In the email, Ball wrote:  "Per Mr. Kastner's email dated November 7, 2024 Bingham Family Alaska LLC is initiating your removal for cause."[323]  Attached to the email was a document drafted by Gabb's counsel, that listed the "LEGAL BASES FOR A 'FOR CAUSE' REMOVAL OF STEPHEN DALBY."[324]  Ball gave Dalby forty eight hours to respond so that his "statement may be included in the stockholder solicitation materials."[325]

In the meantime, Gabb's counsel continued working on the CIS and looking for feedback from Company management.[326]  The day after Ball notified Dalby that Blue Diamond was seeking his removal, DCC advised that "[t]he only open item is a contact e-mail or number ideally from Blue Diamond who the stockholders could call with questions."[327]  DCC explained, "it is just better from an optics and litigation

---

[322] JX 481.

[323] *Id.* at 1.

[324] *Id.* at 2; Pre-Trial Stip. ¶ 115.

[325] JX 481 at 1.

[326] *E.g.*, JX 493.

[327] *Id.* at 1.

perspective if the contact is from Blue Diamond."[328]   In the next draft, DCC "eliminated a reference to the executive committee."[329]

### 6.      The Final KRDL Report

On November 10, 2024, Clayton received KRDL's "final" report and invoice.[330] The attached report was just several pages long and indicated that "[f]urther investigative efforts would be required in order to establish sure connection between subjects and areas of interest."[331]  The report noted that "[a]ll current findings are circumstantial at best" and "at this time we cannot validate all aspects of the investigation."[332]  Finally, based on its findings—presumably the police reports— KRDL "advise[d] physical security measures and precautions to ensure safety for all associated parties."[333]

Indeed, about a month later, Randle sent an email "asking this board to stop requesting in-person board meetings with an unhinged founder" because he had

---

[328] *Id.*; *see also* JX 488 at 1 ("We think that it would be a good idea to include a name/phone/e-mail of a representative of Blue Diamond for optics and settlement agreement purposes.").

[329] JX 493 at 1; *see also id.* at 20 (redline showing reference to Executive committee was deleted).

[330] JX 399.

[331] *Id.* at 2.

[332] *Id.*

[333] *Id.*

"legitimate[ ] . . . concerns for [his] safety and the safety of [his] family."[334] Randle did not send the email to the Dalbys, but included Dalby's most recent Common Director designee, Michael Hammond,[335] on the thread.[336] Randle continued, writing:

> I walk to my car every night checking to see if he is in the parking lot. I constantly check the perimeter of my house to see if he is stalking us. My wife will not leave our kids home alone for any extended period due to her real concerns about Stephen [Dalby]. We have hired undercover security to sit in our office lobby on multiple occasions because he has threatened to show up. After the shooting in NYC this past weekend, it weighed heavily on my mind that he could very well do the same thing to me or someone in my family. We all know he hired a private investigator to follow me for a period of time until I found out about it and called the agency. Here I am at 4:30 am in the middle of the night, sending an email because I can't sleep due to all of this absurdity.[337]

Although Randle did not copy Dalby or Jana on the email, Dalby soon learned about it. He texted Jana the next day, writing in shocking fashion:

---

[334] JX 473 at 3; *see also* TT 393:12–394:18 (Randle) ("[W]hen I started at Gabb, again, there for a very short period of time Mr. Dalby, when referencing Bill Brady, who was a former employee, he said to me on at least two occasions, I'm going to crush Bill Brady's skull and I'm going to bury his kids six feet under. Even as a couple of weeks ago, I was at a business opening event for a friend and one of our investors on the Gabb cap table was there and came up to me and said, I've never said this out loud before, but I want you to know, Stephen Dalby used to consistently tell me that he wanted to kill Landon Ainge and his kids."). Randle also expressed concerns for the safety of his family in September 2024, sharing with Tall that "Dalby is calling my phone back to back . . . . He is becoming more sporadic and aggressive." JX 331 at 1.

[335] Dalby designated Michael Hammond to the Board as a Common Director on November 13, 2024. Pre-Trial Stip. ¶ 24. Hammond filled the vacancy created by the resignation of Steven Zolman, who resigned from the Board on July 22, 2024. *Id.*; JX 402; *see also* JX 443 (texts from Kastner describing Hammond as "seemingly a genuinely good-intentioned and qualified board member who knows Dalby's craziness, but also recognizes his rights as a shareholder . . . .") .

[336] JX 473 at 2.

[337] *Id.* at 3.

63

[N]ate [Randle] sent them all an email saying that he's afraid for his life . . . After the ceo shooting in [N]YC haha what a puss[.] He says that every night he goes to his car and is afraid that I'm in the parking lot . . . These guys are painting me like I'm some [k]ind of psycho[.][338]

In the meantime, Clayton had asked KRDL to investigate the Dalbys further, to "get [Gabb's management] to a point where [it] would feel comfortable using the results if this ever went to court and were litigated."[339] On December 5, 2024, KRDL provided Clayton with an update.[340] Following the update, Clayton let Gabb management and the preferred directors know: "[We] now feel confident that Stephen [Dalby] posted false reviews that we can substantiate. There is one review in particular they feel like they have an open and shut case on-IP addresses, device addresses and meta data that are connected to Stephen's home directly."[341] That review was posted on Glassdoor by an anonymous user and was titled "Gabb Ships Junk Tech."[342] Clayton included a screenshot of the review with her update.[343]

---

[338] JX 476 at 2–4.

[339] JX 460 at 2; *see also* JX 433 (email from Randle to Ball, stating: "We have a group that is working on taking the negative reviews from substantial evidence to definitive.").

[340] JX 460 at 1.

[341] *Id.* at 2.

[342] *Id.*

[343] *Id.*



Gabb does not care about or support their essential workers. The pay is extremely low for this industry and the level of stress is very high. Training does not prepare you at all for this job. Executive management is completely oblivious and REFUSE to acknowledge the severe staffing issues and widespread daily technical problems. Gabb produces low quality software and they ship junk tech. I'm not proud to tell people I work for Gabb because of how awful the user experience is. TL's don't even know how to troubleshoot the products. I feel extremely helpless working here. They expect world class service with barely enough resources to help their "most important asset", the customer. Our team gets zero recognition in any corporate meetings. For your own mental health's sake, do not work here. Gabb cares more about marketing their product instead of delivering a good product. There is zero incentives for anyone working in operations. The hype is not worth any of this.

In her update, Clayton wrote: "With these results I would feel comfortable taking this before any judge or jury. . . I imagine [Dalby] would have a huge uphill battle to show an alternative explanation."[344]

At trial, Clayton and Randle referred to a document titled "KRDL SERVICES UPDATE" as KRDL's "final report."[345] The "final report" indicated that "[s]ecure string Ids demonstrate positively that client devices from IP-addresses posted multiple reviews on website[,]"[346] but also included disclaimers similar to the ones found in the Preliminary Report.[347] The "Gabb Ships Junk Tech" review was included in the CIS.[348]

---

[344] *Id.* at 4.

[345] JX 1145; *see* TT 11:20–12:22 (Clayton); TT 559:16–23 (Randle).

[346] JX 1145 at 10.

[347] *Id.* at 11.

[348] JX 619 at 5. Plaintiffs point out that the KRDL reports were "prepared by nameless person(s) who did not attend trial and would not even respond to a subpoena" and that "Defendants did not validate KRDL's methodology or findings" at trial. Pls.' OB at 1, 58. Because I need not reach the parties' disputes over the substance of the reports, I do not rely on them for purposes of this ruling.

### 7. Blue Diamond Negotiates with Dalby

On December 11, 2024, Ball met with the Dalbys.[349] When Clayton learned that Ball's meeting was set for Gabb's office, she helped arrange a new location for the meeting behind the scenes because "Gabb has several employees who are fearful of Mr. Dalby."[350]

About a week later, Ball followed up with Dalby over text and email but did not hear back.[351] So Ball emailed the Dalbys, the Preferred Directors, and management a video and a memorandum summarizing his meeting with the Dalbys and offering a "Proposal." The Proposal aimed to provide a "path forward" for Dalby and provided in relevant part:

> We would like Blue Diamond Capital to be named as a board member (replacing Jana) for as long as our debt is outstanding. This would eliminate any potential risk of board instability, would bring a qualified member to the board, and would improve relationships with outside lenders and potential capital investors. You (Stephen [Dalby]) would remain on the board and I would invite Jana to continue attending board meetings. I have no problem with her having access to the information (presumably you're sharing it anyway offline) but there is a significant issue of her being a direct official representative on the board. . . . [P]art of our commitment to you would be to improve the cadence of board meetings. I believe the board should be meeting basically twice monthly until further notice and at a minimum once quarterly in person. I would also commit to meet with you directly as frequently as you needed to talk though frustrations, questions, or anything ese that would need to be addressed. We could meet informally directly after each board meeting if you would like to debrief and I could walk through the

---

[349] TT 373:15–18 (Ball).

[350] (Clayton) Dep. 356:13–357:23.

[351] JX 507 at 1; JX 914.

business decisions and votes in additional detail. I'd even commit to visit you in person in Boise quarterly if that is helpful.[352]

Ball also cautioned that "fighting and legal battles" would "result[ ] in downward value for [Dalby] and all of the stakeholders in Gabb."[353] When he made this proposal, Ball was aware of all the reasons for Dalby's removal.[354] That same day, Foley sent Clayton a draft "amended and restated [V]oting [A]greement" that would put Ball on the Board as one of the Common Directors.[355]

Three days later, Ball texted Cole, Randle, and Clayton, writing, "Dalby says he'll remove Jana and name somebody (not me but a qualified person) and remove his ability to remove that person. Thoughts?"[356] Cole responded: "We don't like the idea."[357]

Meanwhile, Gabb's management and Delaware counsel worried that Ball's proposal jeopardized Blue Diamond's ability to solicit Dalby's removal. On December 18, 2024, Clayton texted Cole:

---

[352] JX 507 at 5–6.

[353] *Id.* at 6.

[354] JX 480; TT 376:20–377:19 (Ball).

[355] JX 511 at 1–3.

[356] JX 535.

[357] *Id.*

67

[LRC] says Brandon [Ball]/Blue Diamond can't be the one to send. [DCC] didn't put it that bluntly. Both say they need to watch the video. [LRC] is worried that it might help Dalby with his claims in litigation.[358]

Cole and Clayton discussed who else might be the sender, floating Lance Black, Gabb's VP of Communications, and Tall as alternatives.[359] But Black was not a viable option and Tall did not own any Gabb stock.[360] So that Tall would own Gabb stock, Cole suggested that Tall exercise an option for one share and pay using Venmo.[361] Company counsel prepared a draft stockholder communication stating that "[t]he [CIS] is being sent on behalf of Spencer Tall."[362] Ultimately, on December 20, 2024, Ball emailed Dalby that Blue Diamond would proceed with the removal solicitation.[363]

### 8. The AIM Note Conversion

On December 22, 2024, Randle called a Board meeting for the next day to address the Company's precarious financial position and a potential path forward: an inside Series B financing round.[364] Gabb had cash flow issues and could not cover

---

[358] JX 515.

[359] *Id.*

[360] *Id.* ("[LRC] thinks that if its [Black] it might as well be Gabb[.]").

[361] *Id.*

[362] JX 513 at 2.

[363] JX 530.

[364] JX 546.

68

operating expenses and payments to major vendors, including Samsung.[365]  In fact,

in early December, the Company had missed a payment to Samsung in order to have

cash to pay another vendor, Foxconn, at the end of the month.[366]  And the Company's

costs had ballooned over the course of the year.  For instance, in October 2024, a

Moelis managing director advising Gabb internally emailed his colleagues at Moelis:

"Why did they increase opex by $18m this year[?]"[367]  A Moelis VP responded:

> August 2024E payroll was up 60%+ YoY.  They have hired [a] bunch of
> people.  A bunch of engineers, new finance people, etc.  Increases in
> every department excluding customer service, which they are largely
> outsourcing now.  It's very difficult to understand given the cash
> constraints, but it has been a conscious choice on the company's part.[368]

That fall, Gabb had tried to secure a $20 million loan from Celtic Bank.[369]  But

the effort went nowhere because Celtic required unanimous approval of their non-

binding proposed term sheet to move forward with basic due diligence and sought a

personal guaranty from Dalby, as the only holder of more than 25% of the Company's

shares.[370]  Dalby did not sign the non-binding term sheet needed to proceed with due

---

[365] JX 465 at 1.

[366] JX 453 at 2.

[367] JX 351 at 1.

[368] *Id.*

[369] *E.g.*, JX 422.

[370] *E.g.*, JX 424 at 11–14; *see also* TT 149:6–13 (Kastner) (describing the proposed terms of the Celtic loan as "totally vulture").

diligence. Now, Gabb was "out of money."[371] Between the end of November and early December, Clayton was taking notes on how a Chapter 11 reorganization would impact the Company.[372] She wrote that a bankruptcy would not "get rid of Dalby" since it "would be unusual for [a] court to interfere [with a] voting agreement."[373]



The Company's financial position was so dire that, in a text exchange, Kastner shared that he was also "finding [himself] brushing up on restructur[ing] reg[ulations]."[374]

The day of the December 23, 2024 Board meeting, Hammond resigned from the Board.[375] Hammond stepped down because Dalby "wanted [him] to vote a certain

---

[371] JX 554 at 2.

[372] JX 812 at 43–44.

[373] *Id.* at 43. Indeed, getting rid of Dalby, rather than saving the company, was management's number one goal. *See* JX 644 (Jan. 17, 2025 email from Kastner, stating that getting rid of Dalby is the "Exec team's seemingly more important goal than saving the company.").

[374] JX 554 at 2.

[375] JX 544.

way."[376]  Just three days earlier, Dalby himself had temporarily relinquished his Board seat "for personal reasons," and so could not attend the meeting.[377]  Hammond intended to vote in favor of the inside Series B, against Dalby's wishes.[378]  Dalby appointed Jana's brother, Jason Hawke, in Hammond's place.[379]

The next day, Baugh texted Mendez: "Stephen removed another [B]oard member?  Put his wife's brother on."[380]  Mendez replied: "Bruh,"[381] meaning "[u]nbelievable[.]"[382]  Baugh replied, referring to Dalby as a "psychopath."[383]  Mendez then texted: "Dropping all the bombs on him on 12/26[.][384]  He laid out the plan: (1) "converting";[385] (2) initiating the Series B; (3) replacing Dalby with Randle as the

---

[376] JX 549 at 2; TT 308:8–19 (Dalby); *see also* JX 554 (text to Kastner, explaining "Mike quit due to him feeling like he had no autonomy to act in the best interest of the company[.]").

[377] JX 541.  Dalby temporarily stepped down from the Board under Section 1.4(e) of the Voting Agreement.  *Id.*  In his deposition, Dalby cited "some pains that were troubling" as the reason why he stepped down.  (Dalby) Dep. 459:23–460:10.

[378] TT 492:24–493:6 (Dalby).

[379] Pre-Trial Stip. ¶¶ 24–25; JX 552.

[380] JX 553 at 2.

[381] *Id.*

[382] (Mendez) Dep. 351:17–18.

[383] JX 553 at 2.

[384] *Id.*

[385] TT 606:16–23 (Mendez) ("Q.  And 'converting' refers to the note conversion at issue in this case; is that correct?  A.  That is correct.  Q. And the note conversion was part of the strategy against Mr. Dalby that you're describing to Mr. Baugh because it would Dilute Mr. Dalby; correct?  A.  That is correct.").

71

CEO Director; and (4) suing Dalby.[386] Three days later, on December 27, 2024, then-Preferred Director Murphy emailed Gabb counsel and others stating: "We are preparing to move forward with the conversion."[387]

Gabb's Delaware counsel had reservations about the plan. As early as November, LRC commented: "I am not sure I understand how the conversion that dilutes Dalby does not violate the Settlement Agreement. I keep getting stuck on the phrase 'no action will be taken that will have the effect of diluting Dalby's rights as a shareholder.'"[388] And DCC described the position that the note conversion could qualify as a "Series B financing" as a "stretch."[389] Aware that the AIM Note conversion might not stand up in court, AIM and Sandlot nevertheless decided to proceed with the conversion.[390]

On December 31, 2024, Bowman emailed Gabb management and counsel detailing steps for the conversion.[391] Cole forwarded the email to Murphy and

---

[386] JX 533 at 2.

[387] JX 563 at 1.

[388] JX 416 at 1; *see also* JX 573 (email from LRC discussing the likelihood that the Delaware Court of Chancery would enjoin the Series B).

[389] JX 396 at 2.

[390] JX 573 (email from Cole, stating "[w]e talked to the Sandlot team and they are good to proceed raising the Series B even though there are risks. They feel it is the best path and puts Dalby on his heels.").

[391] JX 574; JX 576.

Kastner, writing "fyi[.]"[392] In the email, Bowman laid out two options.[393] The first option included converting the $1.5 million AIM Note under Section 2(a) into Optional Conversion Preferred Stock, or what Bowman referred to as "Series B Preferred Stock."[394] The AIM Co-Invest Entities, as well as other noteholders, would have the option to convert into Optional Conversion Preferred Stock too. In addition to converting, AIM would also purchase another $1 million worth of Optional Conversion Preferred Stock,[395] infusing the Company with "desperately need[ed]" cash."[396] The conversion would then be declared the "Series B" funding round, as defined in the Settlement Agreement and the "Next Equity Financing" as defined in the Amended and Restated Voting Agreement.[397] This would be used to claim satisfaction of the first of two triggers for Dalby to lose the CEO Director seat under the Amended and Restated Voting Agreement and Settlement Agreement and terminate Dalby's anti-dilution protection under the Settlement Agreement.[398] And Bowman explained that Dalby could then be replaced as the "CEO Director" by

[392] JX 576.

[393] JX 574.

[394] *Id.* at 1.

[395] JX 575 at 1.

[396] JX 670 (Jan. 21, 2025 email from Cole, sharing an overdraft notice and writing: "We are overdrawn by $137k. . . . I know AIM has $1 million ready to wire in once the conversion agreement is signed. We desperately need this money."); TT 481:11–20 (Murphy).

[397] JX 574 at 2.

[398] *See id.*

Randle.[399] But this all hinged on the Company's Board and stockholders approving an amendment to the Company's charter to create the new class of Optional Conversion Preferred Stock.[400]

The second option kicked in if the Board and stockholders did not approve the charter amendment.[401] In that case, the noteholders would convert their notes to common stock instead of Optional Conversion Preferred Stock.[402] The other parts of the plan remained largely the same.[403] In late December and early January, Bowman prepared a model of how the conversion would dilute Dalby and other stockholders and shared it with Gabb's management.[404] Cole forwarded Bowman's December email about the model to Murphy, writing, "I'll stop by shortly to discuss[.]"[405]

On January 3, 2025, AIM Ventura provided Gabb notice of its election to convert under Section 2(a) of the Convertible Note and purchase an additional $1

---

[399] *Id.*

[400] *Id.* at 1–2.

[401] *Id.* at 2.

[402] *Id.* at 2.

[403] *See id.* at 2–3.

[404] JX 560 (noting that conversion plus additional investment would dilute Dalby to 25.13% ownership and 31.09% voting rights); JX 578 (revising calculation to 25.11% ownership and 28.94% voting rights). At the time, Murphy was still AIM's designee to Gabb's Board. Pre-Trial Stip. ¶ 14. Murphy was replaced by Kastner as AIM's designee on January 19, 2025. *Id.*

[405] JX 1308 at 1.

74

million in Series B Preferred Stock.[406] Foley—despite being Gabb's counsel—"took the primary pen" in drafting the paperwork for AIM's Note Conversion, including the notice that AIM Ventura sent to the Company.[407] Murphy testified that as AIM Ventura's sole decision-maker, he was responsible for AIM Ventura's election to convert.[408] He explained that the decision was motivated by Gabb's urgent needs for cash.[409] Bankruptcy at Gabb would result in major financial consequences for AIM and potentially its investors.[410]

The next day, Randle emailed the Board to let it know that AIM had elected to convert the AIM Note into preferred shares and would be providing an additional $1 million which would "help [the Company] immediately start to pay . . . outstanding invoices with key suppliers."[411] Randle shared that Sandlot and Blue Diamond had

---

[406] JX 589.

[407] TT 634:4–23 (Bowman).

[408] TT 444:18–445:2, 481:6–20 (Murphy).

[409] TT 481:10–20 (Murphy). *But see* JX 447 (Dec. 2, 2024 text from Kastner, writing: "After listening to [Cole's] logic on how Gabb is going to navigate issues with Dalby's [sic] and managing cash/debt, we should NOT consider converting anything off of the debt stack.").

[410] TT 480:14–481:5 ("AIM has returned roughly 50 percent of committed capital to its LPs, so it has another 50 percent to go for [carried interest] to apply. Honestly, it basically almost entirely hinges on the financial performance of Gabb."); *see also* JX 554 at 3 (text message from Kastner, writing: "If Gabb goes, it might be tough to run the fund as-is. A wind down is expensive.").

[411] JX 596 at 1.

also elected to convert.[412] He called a Board meeting for the following Monday to "discuss next steps on creating the preferred shares to allow them to convert."[413]

On January 8, 2024, after Jana let Randle know that she could not attend the Monday Board meeting,[414] Randle emailed the Board again, urging "[w]e really need to meet ASAP."[415] He explained:

> The need for a board meeting is procedural at this point. The decision to take AIMs money in early July (that as a reminder both Jana and Stephen [Dalby] agreed to) came with obligations. Among those obligations is that the company is required to convert the note to equity upon AIMs election . . . The board has the responsibility to keep the company out of default.[416]

### 9. Gabb's Stockholders Vote to Remove Dalby

On January 14, 2025, Dalby exercised his right under Section 1.4(e) of the Amended and Restated Voting Agreement to return to the Board.[417] Later that day, DCC updated the CIS,[418] and Foley distributed the CIS to Gabb's stockholders via

---

[412] *Id.* From Cole's perspective, the contemplated conversion by AIM Ventura, the AIM Co-Invest Entities, Sandlot, and Blue Diamond would eliminate approximately $14 million in principal debt (not including interest). TT 408:22-410:17 (Cole).

[413] JX 596 at 1.

[414] JX 605 at 3.

[415] JX 613 at 1.

[416] *Id.*

[417] JX 627.

[418] JX 628.

DocuSign.[419]  The CIS stated that one of the Blue Diamond entities, Bingham Family Alaska LLC, is "sending this Confidential Information Statement to the stockholders of Gabb Wireless, Inc. . . . to solicit proxies in favor of the removal for cause of director Stephen Dalby . . . ."[420]  The CIS explained that Blue Diamond was "taking this extraordinary action because we believe that the actions of Dalby have been so egregious, so offensive and so damaging to the Company's business that it will suffer imminent irreparable harm if Dalby is not removed."[421]  Black subsequently emailed Gabb's stockholders to alert them of the stockholder solicitation to remove Dalby.[422]

The Preferred Directors and Gabb management scrambled to contact stockholders to advocate for Dalby's removal.[423]  It was "all hands on deck,"[424] with Gabb's management even enlisting Butler and Tall—two of Dalby's former Common Director designees—to persuade stockholders to vote for Dalby's removal.[425]  The mentality was "[i]f Dalby is talking to [stockholders] we need to be talking to them

---

[419] JX 629; *see* JX 610.

[420] JX 619 at 1.

[421] *Id.*

[422] JX 629; JX 630; *see also* JX 633 (text messages from Black to Gabb stockholder, explaining: "You should have received two emails tonight.  One from Foley, Gabb's law firm, and one from me explaining the Foley email.").

[423] JX 702; JX 577 at 3 (Jan. 19, 2025 text from Randle, stating: "We have been on the phone non stop since the info went out."); TT 530:12–534:24 (Randle); *see also* JX 819 (Gabb Cap Table with notes on which stockholders Cole and Black will reach out to).

[424] JX 577 at 3.

[425] *See id.*

10x more."[426]  On January 27, 2025, Dalby emailed stockholders stating, "I believe the best approach is for anyone who genuinely wants to hear my side of the story and make an informed decision to reach out to me directly."[427]  Dalby sought to have private meetings with stockholders to "create a more comfortable environment for any questions" and "allow for some level of anonymity if desired."[428]  Referring to Dalby's meeting with stockholders, Randle texted Ball, stating "we're going to let him lie/fumble on the call tonight." [429]  When it looked like stockholders weren't receiving a Zoom link to meet with Dalby, Randle followed up, writing, "I think [Dalby] knows several people are going to record [the meeting] and he can't not lie so the conundrum is real."[430]

As they sought stockholder votes in favor of Dalby's removal, Gabb's management was also closely monitoring the tally.[431]  Blue Diamond did not tally the votes.[432]  Given Dalby's stock holdings, the margin in favor of removal was narrow,

---

[426] *Id.* at 3.

[427] JX 1119.

[428] *Id.*

[429] JX 693.

[430] *Id.*

[431] JX 681 at 2; JX 702.

[432] TT 384:9–17 (Ball); TT 16:14–22 (Clayton).

with Clayton's tracking spreadsheet showing 50.081% voting for removal.[433] But, out of the all the stockholders that voted, only Dalby and two other stockholders voted against Dalby's removal.[434]

On January 28, 2025, Clayton emailed Ball stating: "We're planning on alerting Stephen today that he has been removed."[435] Clayton added that "[w]e're hoping to include a letter from you as well sharing the news" and attached a draft letter for Ball's review.[436] Clayton sent the letter to Ball via DocuSign for execution.[437]

Later that day, Randle notified Dalby that the majority of stockholders had voted for Dalby's removal.[438] Black subsequently emailed Gabb stockholders that "[s]tockholders holding at least a majority of the outstanding voting power of the capital stock have acted to remove Dalby for cause."[439]

---

[433] JX 702. According to Clayton's spreadsheet, Dalby's stockholdings represented 48.893% outstanding stock. *Id.*

[434] *Id.*; *see also* TT 16:23–28 (Clayton) ("Mr. Dalby owns almost 49 percent, 48 point something percent of the company. So that meant that over 50 percent of the stockholders would need to vote, which meant that basically every single other shareholder would need to vote in favor of his removal, which was something like 80 shareholders.").

[435] JX 701 at 1.

[436] *Id.* at 2.

[437] *See id.*; JX 699 at 7.

[438] JX 711.

[439] JX 699 at 5.

### 10. Kastner and Mendez Approve the AIM Note Conversion

Shortly after Randle notified Dalby of his removal, he sent an email requesting that Dalby remove Hawke from Gabb's Board because of Hawke's status as a "Disqualified Designee" under the Voting Agreement.[440] The attached letter provided that "[s]ince his election, the Company raised concerns regarding Mr. Hawke's trading history and whether his election violated the terms of the Voting Agreement."[441] Indeed, about a month earlier, when Dalby first appointed Hawke to the Board, Murphy emailed Gabb management, Mendez, Kastner, and AIM's counsel, writing, "I question how appropriate it is to allow Jason Hawke on the Board." Murphy shared a link to the Securities and Exchange Commission's website and explained that "in [Hawke's] Investment Advisor Public Disclosures, he has 13 disclosures, many of which resulted in termination from his firm and/or settlements with clients. We would not hire someone with a compliance record like this at Adams Wealth . . . ."[442] When Randle confronted Hawke about his trading history, Hawke tried to explain away the disclosures by stating:

> [W]hen you manage as much wealth as I do, their [sic] is a low life group of attorneys chasing ambulances that are mainly back east that are fishing for clients, and because they can't market to individuals they do commercials and google search jargons that attract special people (all

---

[440] JX 715 at 1–3; *see* JX 27 § 5.3.

[441] JX 715 at 2.

[442] JX 545 at 1.

losers in my opinion).  None of these marketing attempts have any merit and no one has attempted to use these scumbags.[443]

Foley also investigated Hawke[444] and discussed Hawke's removal from the Board with Delaware counsel.[445]  After the two Common Directors voted Hawke Chairman, the urgency to remove him increased.[446]  As Randle explained, management and the Preferred Directors felt that they "[c]an't have him as chair or with due diligence [sic]" because "no one outside [G]abb will invest (debt and/or equity) if they find out about his SEC breaches/fines."[447]  But ultimately Randle decided to wait until Dalby was removed before removing Hawke.[448]  The new plan was to either convince Dalby to remove Hawke or, if Dalby refused, for the Company use the Irrevocable Proxy and Power of Attorney contained in the Amended and Restated Voting Agreement to remove him.[449]

On January 30, 2025, shortly before the first Board meeting scheduled following Dalby's removal, Randle circulated a written consent to remove Hawke as a director stating he was exercising the CEO's proxy under the Irrevocable Proxy and

---

[443] JX 659 at 5; JX 563 at 1.

[444] *See* JX 561.

[445] *See* JX 565.

[446] JX 606.

[447] JX 659 at 9.

[448] *Id.* at 2.

[449] *See id.* at 1–2.

Power of Attorney provision of the Amended and Restated Voting Agreement to vote Dalby's shares to remove a "Disqualified Designee."[450]

Kastner and Mendez went forward with the Board meeting.[451] Mendez, Kastner, Cole, Clayton, and Bowman attended the meeting.[452] At the meeting, Kastner and Mendez passed resolutions approving the AIM Note conversion.[453] Kastner and Mendez also passed a resolution recommending that the Company's stockholders approve and adopt an Amended and Restated Certificate of Incorporation authorizing Series B Preferred Stock by written consent.[454] As of trial, the Company's stockholders had not approved the Amended and Restated Certificate of Incorporation.

The day before the meeting, Murphy and Adams had texted about AIM's plans for the company once AIM's Note conversion was approved.[455] Murphy summarized the plan, writing:

> Take over the board [sic] force cost cuts. Suspend all bonuses. Immediately approve another round of equity financing. Once they have budget to pay someone good, move [Cole] to COO and hire a new CFO.

---

[450] Pre-Trial Stip. ¶ 27; JX 731. On February 6, 2025, Hawke's regulatory compliance counsel sent Foley a letter asserting the claimed removal of Hawke was improper and that Hawke "remains a registered investment adviser in good standing." JX 766 at 2–3.

[451] JX 744 at 1.

[452] *Id.*

[453] JX 472 (Resolutions Approved at the January 30, 2025 Board Meeting).

[454] *Id.*

[455] JX 716.

82

The CFO will have a fitting resume for a CEO and if [Randle] and [Cole] can [sic] get their sh*t together we'll send them packing[.][456]

Murphy explained that they "[n]eed this clown car to stay on the road until we wrangle enough power to fix it[.]"[457] Because the Company would not have enough money to cover AIM's legal fees, Murphy planned to "take what we want from the company too[.]"[458]

## L.    This Litigation

On February 10, 2025, Plaintiffs filed their Complaint.[459] Ten days later, AIM filed its Complaint-in-Intervention.[460] On February 25, 2025, Plaintiffs filed a counterclaim.[461] Gabb filed a response of no position to both AIM's Complaint-in-Intervention[462] and Plaintiffs counterclaim.[463]

---

[456] *Id.* at 2 (profanity edited).

[457] *Id.*

[458] *Id.*.

[459] Pre-Trial Stip. ¶ 171.

[460] *Id.* ¶ 172.

[461] Dkt. 29.

[462] Dkt. 33.

[463] Dkt. 79.

On April 2, 2025, Plaintiffs filed a Motion to Compel.[464]  Following a hearing, I granted the motion.[465]  Two days later, on April 4, 2025, AIM filed its own Motion to Compel.[466]  The parties agreed to a resolution of AIM's motion.[467]

I held a two-day trial on May 8 and May 9.  Following full briefing, I heard post-trial argument on July 21, 2025.

## II.    ANALYSIS

In Count I of their Complaint, Plaintiffs seek a declaration under 8 *Del. C.* § 225 that the "for cause" removal of Dalby was invalid.[468]  The Dalbys, as Plaintiffs in the Section 225 action, bear the burden of proving by a preponderance of the evidence that they are entitled to relief.[469]  They have met that burden.[470]

In Count I of their Complaint-in-Intervention, Intervenor Plaintiffs allege that the Company breached the terms of the AIM Note.  As relief, Intervenor Plaintiffs seek an order of specific performance requiring the Company to convert the principal

---

[464] Dkt. 93.

[465] Dkt. 121; Dkt. 128, Tr. of Apr. 4, 2024 Oral Arg. and Rulings of the Court on Pls. Mot. to Compel.

[466] Dkt. 102.

[467] Dkt. 115; Dkt. 119.

[468] Dkt. 1, Compl. ¶¶ 111–119.

[469] *See In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008).

[470] This decision does not address Plaintiffs' claim for contractual fee-shifting, which is Count II of Plaintiffs' Complaint.  *See* Pls.' OB at 93 (requesting the opportunity to submit a fee application should the Court enter judgment for the Dalbys).

and interest amounts into Optional Conversion Preferred Stock, as defined in the AIM Note. In Count II, Intervenor Plaintiffs seek declaratory relief that the Company must issue shares of Optional Conversion Preferred Stock to AIM Ventura and the AIM Co-Invest Entities, among other declaratory relief.

Intervenor Plaintiffs must prove their breach of contract claim and declaratory judgment claims by a preponderance of the evidence.[471] As for Intervenor Plaintiffs' request for an order of specific performance in connection with Count I, the burden is higher: They must prove by clear and convincing evidence that they are entitled to specific performance.[472] Intervenor Plaintiffs have met their burden on proving their breach of contract claim but have not met their burden on establishing that they are entitled to specific performance.

Finally, it is worth noting that Plaintiffs, Defendants, and Intervenor Plaintiffs put forth a host of arguments that I do not address for the sake of brevity. I only address the subset of arguments necessary to reach a decision in this case.

---

[471] *See Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015); *Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard. Under that standard, . . . a claimant asserting a breach of contract must prove the elements of its claim by a preponderance of the evidence."), *aff'd*, 991 A.2d 1153 (Del. 2010).

[472] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1154, 1158 (Del. 2010) ("*Osborne II*") (citing *United Rentals Inc. v. RAM Hldgs. Inc.*, 937 A.3d 810, 834 n.112 (Del. Ch. 2007)).

## A.    Dalby's "For Cause" Removal Is Invalid

Because stockholders were unaware that the removal effort was spearheaded by one faction of the Board and management and that Blue Diamond had offered Dalby a proposal that would have allowed him to stay on the Board, Dalby's removal is invalid.

Plaintiffs advance a host of other arguments for why the CIS shared with Gabb's stockholders was incomplete.[473]  But, because I conclude that the CIS was materially deficient in at least two ways, I need not reach these arguments.

Likewise, I need not reach whether the substantive allegations about Dalby contained in the CIS were materially false or misleading or whether the allegations against Dalby met the high bar of "for cause" removal under Delaware law.  But a disclaimer is perhaps necessary:  My findings in favor of Plaintiffs on Count I should in no way be taken as an endorsement of Dalby's behavior and actions.

A stockholder vote "procured by the use of materially false and misleading proxy materials" should be set aside.[474]  "An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote."[475]

---

[473] *See* Pls.' OB at 81–83.

[474] *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11 (Del. Ch. 2002).

[475] *Rosenblatt v. Getty Oil Co.*, 493 A. 2d 939, 944 (Del. 1984) (quoting *TCS Indus., Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 499 (1976)).  Given management and the Preferred Directors' extensive involvement in Dalby's removal effort and the use of Company

As already discussed, the CIS was materially omissive for at least two reasons. First, the CIS did not disclose that Blue Diamond was merely a "nominal sender." Second, the CIS did not disclose that just weeks before Foley circulated the CIS to stockholders, Blue Diamond had proposed that Dalby could stay on the board so long as he removed Jana and appointed Ball in her place.

### 1. The CIS Failed to Disclose that Blue Diamond Was Just a "Nominal Sender"

The CIS received by stockholders presented the removal effort as Blue Diamond's solicitation. The CIS explicitly stated that one of the Blue Diamond entities, Bingham Family Alaska LLC, is "sending this Confidential Information Statement to the stockholders of Gabb Wireless, Inc. . . . to solicit proxies in favor of the removal for cause of director Stephen Dalby . . . ."[476]

But Blue Diamond was merely the "nominal sender."[477] The CIS omits that the solicitation was developed, prepared, and carried out by one faction of the Board and their management allies using Company resources. A reasonable Gabb stockholder would certainly have regarded the omitted information as material in deciding how to vote. Even if Blue Diamond truly believed that Dalby should be removed for cause (more on this later), given the substantial degree of the Preferred

---

resources for the effort, this case stands in stark contrast to *Kerbawy v. McDonnell*, 2015 WL 4929198, at *14–16 (Del. Ch. Aug. 18, 2015).

[476] JX 619 at 3.

[477] JX 407 at 1.

Directors' and management's involvement in the solicitation effort, their role should have been disclosed.

In fact, the totality of the evidence convinces me that that the primary goal behind management asking Blue Diamond to be the face of the removal effort was to make Dalby's removal more palatable to Gabb's stockholders. The Preferred Directors and management wanted to show that a "separate party" not previously involved in litigation with Dalby "was showing sufficient frustration at the situation as to take an action instead of the ones that have already previously made motions against [Dalby]," namely, AIM and Sandlot.[478] Taking the record created at trial as a whole, the conclusion that management and the Preferred Directors thought that stockholders were more likely to support Dalby's removal if the solicitation came from an independent stockholder rather than from AIM and Sandlot is inescapable. All the more so given the past litigation between Dalby, AIM, and Sandlot.

And references to management and the Preferred Directors' involvement in the removal effort were not omitted accidentally, but by deliberate choice. For instance, when drafting the CIS, Gabb's Delaware counsel pushed for Blue Diamond's contact information to be included on the CIS as opposed to contact information for Randle or another member of the management team.[479] Delaware counsel explained that including Blue Diamond's contact information on the CIS was "just better from an

---

[478] JX 417 at 1.

[479] JX 493 at 1; JX 488 at 1.

88

optics and litigation perspective."[480] The concern over the "optics" of management's involvement in the effort demonstrates that fact too was plainly material: The "optics" would be bad if management's role in the removal effort was clear, and stockholders might not have voted for Dalby's removal.

In trying to explain why the Preferred Director's role in the removal effort was omitted from the CIS, Defendants assert that "if the CIS had said more about the Board supporting the endeavor, Plaintiffs could just as easily complain about the Board 'piling on' to Dalby."[481] But, as Plaintiffs ably explain, the question is whether the CIS was materially incomplete, not what the Plaintiffs could "complain about."[482] Defendants also argue that I can "deem the vote ratified based on the record that Dalby reached out directly to stockholders in an unsuccessful attempt to persuade them to change their votes—and instead they reaffirmed (albeit informally) that they were maintaining their votes in favor of removal."[483] But, as Plaintiffs point out, before discovery, Dalby might have believed, but could not confirm, that Blue Diamond was just a "nominal sender."[484] And Dalby's advocacy against his removal

---

[480] JX 493 at 1; *see also* JX 488 at 1 ("We think that it would be a good idea to include a name/phone/e-mail of a representative of Blue Diamond for optics and settlement agreement purposes.").

[481] Dkt. 158, Defs.' Answering Post-Trial Brief ("Defs.' AB") at 39–40.

[482] Dkt. 161, Pls.' Combined Post-Trial Reply Brief and Answering Brief on AIM's Claim-in-Intervention ("Pls.' RB/AB") at 13.

[483] Defs.' AB at 45.

[484] Pls.' RB/AB at 13, 17.

89

does not somehow change the fact that the CIS was materially incomplete. Notably, only 50.081% of stockholders voted for Dalby's removal. It would be a fallacy to suppose that a stockholder who succeeds in obtaining enough votes to remove a director "for cause" through a materially false and misleading proxy would necessarily obtain the requisite number of votes if it had distributed complete proxy materials to stockholders.[485] All the more so here where the removal effort succeeded by only a slim margin. Nevertheless, there is "no requirement to show a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote."[486]

## 2. The CIS Failed to Disclose that Blue Diamond Offered Dalby a Proposal that Allowed Dalby to Remain on the Board

The CIS also stated that Blue Diamond "believe[d] that the actions of Dalby have been so egregious, so offensive and so damaging to the Company's business that it will suffer imminent irreparable harm if Dalby is not removed."[487] Yet, just a few weeks before the CIS was sent to stockholders, Ball had suggested that Dalby could stay on the Board if he agreed to substitute Jana with a Blue Diamond designee.[488]

---

[485] *C.f. Superwire.com, Inc. v. Hampton,* 805 A.2d 904, 912 (Del. Ch. 2022) ("[I]t is a fallacy to suppose that a stockholder who succeeds in obtaining enough consents to remove a director 'for cause' without affording the director notice and an opportunity to be heard would necessarily obtain the requisite number of consents if it complies with the law . . . .").

[486] *Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at *10 (Del. Ch. Oct. 23, 2013) (citation modified).

[487] JX 619 at 1.

[488] *See* JX 507 at 5.

90

Knowing all the information contained in the CIS, Blue Diamond was agreeable to Dalby staying on the Board. This would support a conclusion that Dalby's presence on the Board was not as imminently and irreparably harmful as the CIS claimed. Certainly, that is a fact that a reasonable stockholder would consider in deciding how to vote.

Moreover, the CIS omitted references to Ball's negotiations with Dalby and his proposal entirely. The record shows that management and counsel were worried about the optics of the proposal, even questioning whether Blue Diamond should continue to lead the solicitation effort.[489] Delaware counsel expressed concern that if Blue Diamond's name remained on the CIS "it might help Dalby with his claims in litigation."[490] After the proposal, management weighed substituting Blue Diamond with another stockholder to front the solicitation effort.[491] So the proposal was a material fact that a reasonable stockholder would consider in deciding whether to vote for Dalby's removal and, thus, material.

In sum, because the CIS was materially omissive, the stockholder vote for Dalby's removal must be set aside.[492]

---

[489] JX 515 at 1; JX 535.

[490] JX 515 at 1.

[491] *Id.*

[492] Because I conclude that Dalby was improperly removed, it necessarily follows that the January 30, 2025 Board meeting lacked a quorum. *See also* Dkt. 169, Tr. of Post-Trial Oral Argument at 62:16–63:3 ("I would agree that if the January 30, 2025, meeting is held to

### B. The Company Breached the Terms of the AIM Note by Failing to Satisfy Its Mandatory Obligation to Convert

To prevail on a breach of contract claim, a Plaintiff must prove "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[493] In construing a contract, Delaware courts endeavor to give effect to the intent of the parties.[494] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[495] The Court will read the contract as a whole and "enforce the plain meaning of clear and unambiguous language."[496]

At the outset, it bears mentioning that no party challenges the validity of the AIM Note or the approval of the AIM Note. Gabb's Board (including the Dalbys), and a majority of Gabb's stockholders (including Dalby), approved the AIM Note.

---

be invalid for lack of a quorum, based on Mr. Dalby . . . remain[ing] a board member, then I do think in this particular case, that request is moot.").

[493] *Kaye v. Fantasea Resorts Grp., Inc.*, 2025 WL 1157217, at *3 (Del. Ch. Apr. 17, 2025) (citation omitted).

[494] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (citing *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[495] *Id.* (quoting *Osborn II*, 991 A.2d 1153 at 1159).

[496] *Id.* (quoting *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1209 (Del. 2021)).

Section 2(a) of the AIM Note provides AIM Ventura may elect to convert "in its sole discretion" after 30 days.[497] Upon AIM Ventura's election, the AIM Note provides that "the Company shall convert the outstanding principal amount of the [AIM Note] and all accrued and unpaid interest thereon into the equivalent number of shares of Optional Conversion Preferred Stock of the Company . . . with a further optional conversion to common at a ratio of 1:2."[498] Delaware courts construe the term "shall" as creating a mandatory obligation.[499]

Here, the use of "shall" in Section 2(a) establishes a mandatory obligation for Gabb to convert the outstanding principal and interest on the AIM Note into Optional Conversion Preferred Stock, with a further optional conversion to common stock, after AIM Ventura's election. Because the Company has not satisfied its mandatory obligation, it has breached the terms of the AIM Note.

Plaintiffs argue that there can be no breach because Section 2(c), entitled "Procedure for Conversion," provides that "[t]he Company shall not be required to issue or deliver the capital stock into which [the AIM Note] may convert until . . . the Company has taken all corporate action required to be taken by the Board and the Company's stockholders, including, without limitation, the filing of an amended

---

[497] JX 226 § 2(a).

[498] *Id.*

[499] *E.g.*, *Giesecke+Devrient Mobile Sec. Am., Inc. v. Nxt-ID, Inc.*, 2021 WL 982597, at *11 (Del. Ch. Mar. 16, 2021), *judgment entered sub nom. Giesecke+Devrient Mobile Sec. Am., Inc. v. NXT-ID, Inc.* (Del. Ch. 2021).

certificate of incorporation with the Delaware Secretary of State authorizing the Optional Conversion Preferred Stock."[500]   But the Delaware Supreme Court has instructed that "[c]ontracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'"[501]

Reading Section 2(c) to relieve Gabb of its mandatory obligation under Section 2(a) would render Section 2(a) "illusory and meaningless."  As Intervenor Plaintiffs explain, Section 2(c) is not a path for Gabb to avoid its mandatory obligation to convert the AIM Note.  Rather, Section 2(c) acknowledges that action by the Board and stockholders is required to authorize Optional Conversion Preferred Stock and prevents the delivery of unauthorized shares.  And there is an incentive for the Board and stockholders to take that action quickly:  If Gabb does not issue the shares within fifteen days of AIM Ventura's notice of conversion, that constitutes a "Default Interest Trigger Event" and the interest rate on the AIM Note increases from 22% to 30%.[502]

---

[500] JX 226 § 2(c). *See* Pls.' AB/RB at 43–44.

[501] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (footnote omitted); *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and will give each provision and term effect, so as not to render any part of the contract mere surplusage.") (citing *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 294783, at *13 (Del. Ch. Oct. 11, 2006)).

[502] JX 226 § 2(c).  By way of contrast, reading Section 2(c) in this way does not render the provision illusory because the provision operates as an incentive for Gabb to deliver the Optional Conversion Preferred Stock quickly.

94

Gabb breached the terms of the AIM Note by failing to satisfy its obligation to convert the outstanding principal amount and interest on the AIM Note into Optional Conversion Preferred Stock.

## C.    AIM Is Not Entitled to Specific Performance

Intervenor Plaintiffs request an order of specific performance requiring Gabb to issue shares of Optional Conversion Preferred Stock to AIM. As counterclaimants, the Dalbys seek declaratory judgments that the increased interest rate following a Default Trigger Event is a liquidated damages provision and that Gabb's failure to deliver Optional Conversion Preferred Stock is an efficient breach.

"A party seeking specific performance must establish that (1) a valid contract exists, (2) he or she is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance."[503] A party seeking specific performance must also demonstrate by clear and convincing evidence that she would have no adequate legal remedy.[504] As already discussed, the AIM Note is a valid contract. And AIM has already performed under the contract by providing Gabb the $1.5 million loan and delivering notice of its election to convert and required documentation. What remains to be resolved is whether the balance of the equities tips in AIM's favor and whether damages would provide AIM adequate relief.

---

[503] *Snow Phipps Grp., LLC v. KCAKE Acquisition, Inc.*, 2021 WL 1714202 (Del. Ch. Apr. 30, 2020) (quoting *Osborn II*, 991 A.2d 1153 at 1158).

[504] *Osborn II*, 991 A.2d 1153 at 1158.

At the outset, it bears mentioning that AIM could have negotiated a voting agreement requiring Dalby and other stockholders to vote to amend the Company's certificate of incorporation to authorize Optional Conversion Preferred Stock or negotiated different terms for the note. AIM did not. As Plaintiffs point out, AIM is asking the Court to order specific performance of a stockholder vote.[505] Plaintiffs also point out that AIM did not cite a single case to support such an order.[506] And AIM did not identify such a case in its reply brief.[507] That alone could be reason enough for me to decline to grant specific performance here. But I do not need to decide that question. Although Dalby's behavior certainly does not tip the scales of equity in his favor, I also cannot say that the equities clearly and convincingly favor AIM. Intervenor Plaintiffs have failed to meet their burden.

"To say that Delaware prides itself on the contractarian nature of its law risks understatement."[508] And yet this Court will not order specific performance if the equities do not favor that outcome clearly and convincingly.

To level-set, it should first be noted that this is not a circumstance implicating a straightforward exercise of business judgment by independent and unconflicted directors and management. Instead, conflicts, and furtive acts, abound. Indeed, the

---

[505] Pls.' RB/AB at 46.

[506] *Id.*

[507] *See* AIM's RB.

[508] *26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 473 (Del. Ch. 2023) (quoting *New Enter Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565 (Del. Ch. 2023)).

96

AIM Note conversion reflects the culmination of a long-running effort by non-neutral management, working with AIM, to vitiate Dalby's bargained-for rights under the Settlement Agreement and Amended and Restated Voting Agreement and thereby "get rid" of the Company's founder and controller.

AIM incredibly says that Murphy explained to Dalby that the conversion would qualify as a "Series B" or "Next Equity Financing." But nothing other than Murphy's self-interested testimony supports such a conclusion. In the Settlement Agreement and the Amended and Restated Voting Agreement, the parties agreed that Dalby would continue to enjoy certain rights until the Company's "next" "bona fide" "financing for the primary purpose of raising capital."[509] The record unequivocally demonstrates that the AIM Note conversion is anything but. Rather, the conversion's primary purpose was to extinguish the rights created by the very agreements that impose this "primary purpose" test.

Intervenor Plaintiffs also ask me to believe that AIM Ventura's election to convert was entirely unrelated to any effort to vitiate Dalby's rights. But, again, nothing in the record other than Murphy's self-serving testimony supports such a conclusion. To the contrary, AIM's Preferred Director designee was tuned into the plan since September 2024. And Cole, the Company's CFO, was a central figure and, being an AIM insider, kept Murphy and Kastner apprised.[510]

---

[509] JX 20 at 1; JX 27 at 1.2(c).

[510] *See, e.g.*, JX 1308; JX 576; Tr. of Post-Trial Oral Argument at 150:4–151:23.

Having sat through trial and considered the record, I conclude AIM presents a narrative that is at odds with the record. As such, I am compelled to conclude that Intervenor Plaintiffs have failed to show that the balance of the equities clearly and convincingly tips in AIM's favor.

AIM's request for specific performance is denied. Likewise, the relief that AIM seeks in Count II of its Complaint is denied. I need not reach Plaintiffs' arguments that the increased interest rate following a Default Trigger Event is a liquidated damages provision and that Gabb's failure to deliver Optional Conversion Preferred Stock is an efficient breach.

## III.  CONCLUSION

Plaintiffs have proved that Dalby's removal from the Board was invalid. Intervenor Plaintiffs have proved that Gabb breached the terms of the AIM Note, but they are not entitled to specific performance.

The parties are asked to submit a stipulated form of order implementing this decision within five business days and to submit a joint letter advising the Court of any issues that may remain to be addressed.